CABLEVISION OF CHICAGO, an Illinois Limited Partnership, and George W. Carlson, Plaintiffs-Appellants,

v.

COLBY CABLE CORPORATION d/b/a United Cable Television of Northern Indiana; Indiana Bell Telephone Company, Incorporated; Northern Indiana Public Service Company, and City of Hammond, Indiana, Defendants-Appellees.

No. 3–780A208.

Court of Appeals of Indiana, Fourth District.

March 9, 1981.

Rehearing Denied May 19, 1981.

Wayne C. Ponader, Theodore J. Nowacki, David R. Day, Bose McKinney & Evans, Indianapolis, William A. O'Rourke, Smith & Funk, Hammond, for plaintiffs-appellants.

James V. Donadio, G. Daniel Kelley, Jr., James A. Shanahan, Indianapolis, John E. Leeney, Alfred R. Uzis, Hammond, Joseph G. Manta, Philadelphia, Pa., Ice, Miller, Donadio & Ryan, Indianapolis, Leeney & Uzis, Hammond, Frumkin & Manta, Philadelphia, Pa., for Colby Cable Corp.

David C. Jensen, Eichhorn, Eichhorn & Link, Hammond, for Indiana Bell Telephone Company and Northern Indiana Public Service Co.

CHIPMAN, Judge.

This is an interlocutory appeal from the denial of a preliminary injunction. The plaintiffs, George Carlson and Cablevision of Chicago, brought this action for declaratory and injunctive relief challenging the validity of a cable television franchise purportedly granted by the City of Hammond to defendant Colby Cable Corporation d/b/a United Cable Television of Northern Indiana (United) in 1971.

Affirmed.

Between December 1970 and April 1971 Julian Colby met with the mayor of Hammond and various members of the city's Common Council (Council) and Board of Public Works and Safety (Board) to discuss the possibility of obtaining a cable television franchise. As a result of these meetings Colby drafted a franchise ordinance which was submitted to the Board at a meeting held February 16, 1971. At this meeting the Board recommended the Colby ordinance be submitted to the Common Council for passage.

On February 22, 1971, the Colby ordinance was introduced to the Council. Following a public hearing and various amendments and deletions,[1] the franchise ordinance was unanimously adopted by the Council on April 2, 1971, and approved by the Mayor April 16, 1971.

During 1973 and 1974 Colby spent approximately $20,000 in obtaining the strand-mapping[2] for the cable television system. For the next several years, however, the project stalled during a period of time coinciding with a general setback in the cable television industry. Then, as the state of the art improved, Julian Colby found himself unable to obtain funds to properly develop a cable television system in the Hammond area. This led to the May 2, 1979, sale of Colby Cablevision Corporation stock to Larry Flinn, and eventually to United. Prior to the sale, Flinn asked for an opinion from the Hammond City Attorney as to the validity of the Colby franchise. In an opinion letter dated April 11, 1979, the City Attorney stated the ordinance was "in full force and effect and has not been amended, rescinded or repealed since the date of passage."

To construct the cable television system it was necessary for United to attach the coaxial cable, which actually carries the television signals, to utility poles owned by two utilities in the Hammond area, Indiana Bell Telephone Company, Inc. (Bell) and Northern Indiana Public Service Company (NIPSCO). United entered into pole attachment agreements with Bell and NIPSCO on July 11, 1979, and October 1, 1979, respectively.

---

1. Any reference to an "exclusive franchise" was deleted, and the ordinance was amended to read, "The residents of the City of Hammond, Indiana shall in no way be obligated to purchase service from the company."

2. We are told "strand-mapping" is the process by which a cable television company prepares a detailed map of all utility poles in the city along the proposed route of the cable facilities.

During the summer of 1979 United opened an office and brought in a chief engineer in order to commence construction. Julian Colby investigated and completed the acquisition of a tower site. Flinn spent the summer obtaining bonds for United, culminating in a $12,000 bond furnished to Bell and a $60,000 bond furnished to NIPSCO, each personally guaranteed by Flinn. In October of 1979 United submitted approximately 102 individual applications for pole license permits to Bell and NIPSCO. A survey for the United applications began November 12, 1979. During the survey, representatives of Bell, NIPSCO and United inspected each utility pole to determine whether it would be necessary to move any of the existing lines in order to attach the television cable.[3] By Christmas 1979, United had expended nearly $500,000 on the project.

The survey was completed February 18, 1980, however, Bell and NIPSCO started moving their respective wires on February 11, 1980, in order to make room for United's cable. By February 15, 1980, United's expenditures on the project totaled approximately $950,000 and by June 1980 exceeded $3,000,000.

Cablevision of Chicago (Cablevision) is an Illinois limited partnership engaged in the business of developing and promoting cable television systems in the Lake County, Indiana and Chicago areas. Daniel Sweeney of Cablevision met with the mayor of Hammond in July of 1979 to investigate the possibility of obtaining a cable television franchise. Sweeney was informed that a non-exclusive franchise had previously been granted to Colby in 1971. Sweeney, an attorney, received a copy of the Colby ordinance on or about August 23, 1979; he testified that he had "severe questions" about the validity of the Colby franchise from the first day he received a copy of the ordinance.

Cablevision and George Carlson, a taxpayer and member of the Hammond Common Council, commenced this action on June 9, 1980, seeking an order declaring invalid the purported cable television franchise Colby received in 1971 and requesting the defendants be permanently enjoined from exercising any of their rights under the 1971 ordinance. Plaintiffs also sought a preliminary injunction to halt any further construction. The complaint primarily questions the validity of United's franchise because the Colby ordinance was not preceded by a contract with the Hammond Board of Public Works and Safety, as required by chapter 21, section 5 of the Cities and Towns Act of 1905, presently Ind.Code 18–1–21–5. Generally, section 5 authorizes a city or town to grant franchises to various public utilities.[4]

The defendants raise several lines of defense. They first contend that in 1971 cable television was not a "public utility" within the purview of IC 18–1–21–5. If, however, we determine cable television was a public utility then they contend the facts establish the company substantially complied with the statutory requirements for obtaining a valid franchise. As additional lines of defense they argue the plaintiffs lack standing to maintain this action and if they do have standing they are barred from relief by the equitable doctrines of estoppel and laches.

Trial of this cause commenced on June 16, 1980, and evidence was presented by all

---

**3.** The National Electrical Safety Code requires at least a 40 inch clearance between a power line and television cable, and at least a 12 inch clearance between the television cable and telephone lines. The lines must also be at least 18 feet above the ground.

**4.** IC 18–1–21–5 provided, in pertinent part:
"Any city or town may by contract, first entered into by the board of public works ..., such contract to be duly approved by ordinance, ... grant to any person or corporation the right to lay down pipes, wires or conduits; to construct sewers or drains; or to erect poles, wires, posts, masts, skeleton towers, and other necessary appliances and structures, in the streets, alleys and other public places of such city or town ... for the purpose of supplying such city or town and its inhabitants with ... means of conveying motive power, heat, light or intelligence for the convenience and welfare of the people."

parties except the City of Hammond.[5] The trial was continued on June 18 to allow for additional discovery. On June 19, the trial court refused to issue a preliminary injunction for the plaintiffs, and this appeal follows.

We affirm.

## I. STANDING

The doctrine of standing serves as a prudential limitation on the ability of individuals to seek redress in our courts. Generally, we yield to the political process and deny standing in those instances where a plaintiff alleges no special injury different in kind from that which is suffered by the community in general.[6] A well established exception to this rule is that a taxpayer may maintain an action when the injury complained of is the unlawful collection or expenditure of public funds. *State ex rel. Haberkorn v. Dekalb Circuit Court*, (1968) 251 Ind. 283, 241 N.E.2d 62; *Zoercher v. Agler*, (1930) 202 Ind. 214, 172 N.E. 186; *Haywood Pub. Co. v. West et al.*, (1942) 110 Ind.App. 568, 39 N.E.2d 785. We also require the plaintiff to allege and show injury to a *present* interest, that is, to demonstrate his injury is more than a remote possibility. *Department of Financial Institutions v. Johnson Chevrolet Co.*, (1950) 228 Ind. 397, 92 N.E.2d 714. Defendants argue neither Carlson nor Cablevision have standing in this case. They contend Mr. Carlson has not alleged nor shown any special injury, and that Cablevision does not have a present interest in the outcome of this litigation. We conclude that only Mr. Carlson should be dismissed from this lawsuit.

The record shows George Carlson has been a member of the Hammond Common Council for twenty-five years. Oddly enough he was the Councilman who introduced the Colby franchise ordinance for approval in 1971. He is a utility user and a taxpayer to "all local governmental entities." Carlson argues that as a taxpayer he has standing to "enforce public rights" where the action of the governmental body is "clearly" or "patently" illegal, citing *Zoercher v. Agler, supra, Montagano v. City of Elkhart*, (1971) 149 Ind.App. 283, 271 N.E.2d 475, and *Meinschein v. J. R. Short Milling Co.*, (1973) 157 Ind.App. 53, 298 N.E.2d 495.

*Zoercher v. Agler* is readily distinguishable. That action was instituted by taxpayers against the City of South Bend and the State Board of Tax Commissioners to challenge the legality of a tax levy. The plaintiffs' standing in *Zoercher* was not based simply upon the fact they were taxpayers; they had standing because there was a nexus between their status as taxpayers and the injury complained of, i. e. the illegal collection of a tax. In the present case Carlson does not seek to challenge the legality of a tax, nor is he alleging the waste of public funds since there is neither a tax nor expenditure of funds by the City of Hammond. There is no connection between his status as a taxpayer and the alleged violation of statute. *Zoercher* simply cannot be read to give any taxpayer standing to enforce any public right.

Carlson also cites *Montagano v. City of Elkhart, supra,* for the proposition that a taxpayer has standing to challenge the actions of a public body which are clearly or patently illegal. In *Montagano* taxpayers of the City of Elkhart sought to challenge an annexation ordinance passed by the city council. They alleged that as taxpayers of the city they would become obligated to pay taxes used to provide the usual municipal services to the annexed area even though the annexation was "invalid and in excess of the jurisdiction and power of [the] City Council." *Id.* at 286, 271 N.E.2d at 477. The *Montagano* plaintiffs clearly satisfied the traditional taxpayer standing requirement by alleging the unlawful expenditure of public funds. However, concerned that "unjustified" interference by taxpayers would threaten the normal functions of city

---

**5.** The City was joined as an indispensable party to this litigation.

**6.** *See, e. g. Indiana Alcoholic Beverage Commission v. McShane*, (1976), 170 Ind.App. 586, 354 N.E.2d 259.

government, the court on appeal looked to the merits of the plaintiffs' action and held that only in "proper" lawsuits may "reasonable inquiry ... be made into the legality of any action taken by elected officials where appropriations have been made, but the court may not substitute its discretion for that of the proper officials." *Id.* at 290, 271 N.E.2d at 480. The court attempted to distinguish between "attackable" and "nonattackable" waste of public funds:

> "[A]ccording to both statutory and decisional law in this state, the council would lack jurisdiction to act if the land to be annexed is not contiguous to the existing boundaries of the city; [citation omitted] or where notice of impending annexation is lacking or improperly given to affected landowners; [citation omitted]. *Attackable 'wastage'* in the sense hereinabove used would also occur where the annexation was *clearly or patently illegal*."

*Id.* at 291, 271 N.E.2d at 480. *Montagano* simply limited the right of a taxpayer to challenge the legality of governmental actions which necessitate the expenditure of public funds, specifically in the area of annexation. The case simply cannot be read to give a taxpayer such as George Carlson standing to challenge the acts of public officials whenever those acts are alleged to be "clearly" or "patently" illegal and regardless of the fact that no waste of the taxpayers' money is involved. Again, there must be a sufficient nexus between plaintiff's status as a taxpayer and the injury complained of; only then does *Montagano's* "patently illegal" test become relevant.

Carlson also relies on the case of *Meinschein v. J. R. Short Milling Co., supra.* The plaintiff in *Meinschein* challenged the legality of a lease of public property granted by the City of Mount Vernon. While the plaintiff was an owner of adjoining land, he did not allege damage to his property. The plaintiff was a taxpayer, but did not seek to challenge the legality of public expenditures. Citing *Zoercher v. Agler*, the First District held:

> "[I]t is not necessary that he [plaintiff] show damage to himself in an action to enjoin the city from committing an unlawful act ...."

*Id.* at 58, 298 N.E.2d at 498. We do not think the First District's reliance on *Zoercher v. Agler* was justified. Unlike the situation in *Zoercher*, the plaintiff in *Meinschein* demonstrated no connection between his status as a taxpayer and the injury complained of, that is, he did not seek to prohibit the illegal collection of a tax, nor did he allege there would be an illegal expenditure by the city. In short, we believe the holding in *Meinschein* to be inconsistent with the law of standing in Indiana, and for this reason afford it little precedential value. George Carlson has neither alleged nor proven any special injury, nor has he brought himself within the exception which allows a taxpayer to maintain an action challenging the legality of a tax or public expenditure. Carlson should therefore be dismissed from this lawsuit.

Defendants also argue that Cablevision lacks the requisite standing to maintain this action because Cablevision has no *present* interest to be protected. Specifically, defendants point to the fact that Cablevision does not have a franchise in Hammond, may never be granted such a franchise, and therefore has no present interest in the outcome of this litigation. We disagree.

The "present interest" requirement exists because our courts are not in the business of answering hypothetical questions which will have no impact on the rights of the plaintiff. However, in this case Cablevision is a company ready and willing to provide cable television service to the Hammond area. A cable television franchise ordinance for Cablevision was passed by the Hammond Common Council on October 22, 1979, the validity of which has not been determined. On February 7, 1980, Cablevision and the Hammond Board of Public Works and Safety entered into a franchise agreement. Cablevision entered into pole licensing agreements with Bell and NIPSCO on January 22, 1980, and April 1, 1980, respectively. On May 28, 1980, Cablevision leased property in Hammond for the site of its tower, warehouse, and

maintenance buildings. Even if the present Cablevision ordinance is found to be procedurally defective, the city has certainly demonstrated a willingness to grant a franchise to Cablevision. In light of these facts, we believe Cablevision has a sufficient present interest in the outcome of this litigation.

Cablevision has also alleged that if it is relegated to the status of "fourth user on the pole," its construction costs will be much higher.[7] Cablevision has therefore alleged special injury.

## II. INJUNCTIVE RELIEF

Appellant Cablevision argues the trial court abused its discretion by denying its request for a preliminary injunction. Cablevision maintains the trial court based the denial on an erroneous conclusion of law, specifically, that Cablevision may be subject to the equitable defenses of estoppel and laches. We find no abuse of discretion at the trial level.

When ruling on Cablevision's request for injunctive relief the trial court was called upon to consider whether the plaintiff would likely prevail on the merits. It was also the court's responsibility to balance the respective interests of the parties and to take careful note of any interest of the public which might be involved. *Elder v. City of Jeffersonville*, (1975) 164 Ind.App. 471, 329 N.E.2d 654.

The major issue before this court concerns the applicability of two familiar equitable defenses, laches and estoppel, both of which were raised by United in its answer. United argues that Cablevision knew of the possible procedural defect in the 1971 Colby ordinance as early as August of 1979, but stood idly by while United expended large sums of money on the construction and development of its cable television system. Therefore, argues United, because Cablevision did not file suit to challenge the United franchise until May 13, 1980, Cablevision

should be barred by the doctrine of laches. With regard to the estoppel defense, United alleges the City of Hammond has consistently recognized the validity of the Colby ordinance since its passage in 1971, and in reliance on this position United has expended in excess of $3,000,000 on the cable television project. United argues that any of the defenses which it could raise against the City of Hammond can be used against Cablevision and, therefore, Cablevision should be estopped from challenging the validity of the United franchise. In response, Cablevision cites a plethora of Indiana decisions for the proposition that actions by a municipality in violation of controlling statutes are void and cannot be ratified, nor are they subject to the defenses of estoppel or laches.

We acknowledge that the general rule in Indiana is that the public, whether it be a state or local governmental body, cannot be estopped by the unlawful acts of public officials. The reason for this rule is said to be that "if laches, waiver or estoppel did apply against the public, a dishonest, incompetent or negligent public official could wreck the interests of the public." *State v. Roberts*, (1948) 226 Ind. 106, 134, 78 N.E.2d 440, 446. (dissenting opinion). Our courts have been particularly unsolicitous of estoppel and laches arguments in cases where the unauthorized acts of public officials somehow implicate government spending powers.

For example, in *Mazac v. City of Michigan City*, (1934) 98 Ind.App. 366, 189 N.E. 400, Mazac entered into a contract with the city to provide garbage collection, but the contract was not submitted to the city council as required by law. Mazac alleged the city was estopped from denying liability under the contract because it had been acted upon and partly performed. Our court rejected the defense, reasoning that since the contract was void, there could be no estoppel. In *Hamer v. City of Huntington*,

---

**7.** The evidence shows that if Cablevision were to proceed to install its cables sometime in the future, it would incur approximately three or four times the expense of United. This is be-

cause a fourth line on the utility pole may require more extensive construction work, i. e., line relocation and pole replacements.

(1939) 215 Ind. 594, 21 N.E.2d 407, the court held a city was not contractually bound to pay for a fire truck because funds for the purchase of the vehicle were not appropriated until after the contract was entered into; Indiana law required that funds be appropriated *before* the contract was made. The court rejected the equitable doctrine of estoppel even though the fire truck had been delivered to and accepted by the city:

"If one dealing with the city could plead ignorance of the laws governing the city or of the appropriated balance which the city has and thereby make valid a contract made by the city contrary to § 48–1507, Burn's, supra, the effect of such statute and *our budget laws would be destroyed.*"

*Id.* at 603, 21 N.E.2d at 411. *See also Citizens Bank of Anderson v. Town of Burnettsville*, (1932) 98 Ind.App. 92, 179 N.E. 724.

Our courts have also been hesitant to allow an estoppel in those cases where the party claiming to have been ignorant of the facts had access to the correct information:

"[P]ersons who deal with the state must take notice of the Constitution, statutes and opinions of our courts of last resort which limit the authority of the officer or employee of the state when he purports to act for the state."

*State v. Roberts*, (1948) 226 Ind. 106, 133, 78 N.E.2d 440, 445. For example, in *City of Evansville v. Follis*, (1974) 161 Ind.App. 396, 315 N.E.2d 724, Follis received a zoning permit from the city's plan commission and a building permit from the city's building commissioner prior to the construction of a swimming pool on his property. After much of the construction had been completed the city issued a stop-work order because the pool encroached upon an unused public easement which extended 12½ feet into Follis' yard. The building commissioner's office had neglected to check property descriptions before issuing the building permit. With regard to Follis' attempt to raise the defense of estoppel, our court stated:

"We experience difficulty applying estoppel to the situation at bar. It has been

held that where the facts are equally known or accessible to all parties concerned, as they were in the case at bar, there can be no estoppel . . . .

\* \* \* \* \* \*

Since neither the City nor the landowners in the case at bar knew the exact location of the boundary line at the time the permit was issued, and since this information was readily accessible to both parties from public records, the requisite elements of estoppel are missing."

*Id.* at 403, 315 N.E.2d at 728. In a similar case, *Middleton Motors, Inc. v. Indiana Department of State Revenue*, (1978) Ind., 380 N.E.2d 79, the complainant was told by the deputy director of the revenue department that his company had two years from the payment of a final installment of back taxes to file for a refund, when in fact the Indiana statute allowed only three months to file. The sole issue on appeal was whether the state could be estopped to assert the three month limitation period because of the erroneous representations made by the deputy director. Our Supreme Court held it could not:

"When the legislature enacts procedures and timetables which act as a precedent to the exercise of some right or remedy, those procedures cannot be circumvented by the unauthorized acts and statements of officers, agents or staff of the various departments of our state government [citation omitted]. *All persons are charged with the knowledge of the rights and remedies prescribed by statute.* See *City of Evansville v. Follis*, (1974) 161 Ind. App. 396, 315 N.E.2d 724. *Appellant's reliance upon the representations of the deputy director was unjustifiable.*" (emphasis added)

*Id.* 380 N.E.2d at 81.

It is certainly not clear in either *Follis* or *Middleton* whether the courts categorically rejected the estoppel argument on broad public policy grounds, or whether the courts simply found an essential element of estoppel to be missing, i. e. justifiable reliance. What is certain is that when our laws clearly limit the authority of government offi-

cials to act, or when the law clearly prescribes a procedure to be followed, private parties must carefully take note of that limitation or procedure before dealing with a governmental entity. *Fort Wayne Patrolman's Benevolent Association v. City of Fort Wayne,* (1980) Ind.App., 408 N.E.2d 1295. Similarly, when the public record contains information relevant to the individual's circumstance, he must seek it out.

■ However, while our courts have been hesitant to accept estoppel or laches as defense to the erroneous action or inaction of government officials, we do not find the application of these equitable doctrines to be absolutely prohibited. In *State ex rel. Agan v. Hendricks Superior Court,* (1968) 250 Ind. 675, 235 N.E.2d 458, our Supreme Court stated:

> "[W]here the public is represented by the State or municipal government or other agencies ... it may be estopped where the necessary elements or grounds were present *as where an inconsistent position has been assumed.*" (emphasis added)

*Id.* at 678, 235 N.E.2d at 460. In his dissenting opinion in *Middleton Motors, Inc., supra,* Justice DeBruler wrote:

> "[T]his court has held that the courts may invoke an equitable estoppel against the State in an appropriate case. I think this is such an appropriate case."

*Id.* 380 N.E.2d at 81. After reviewing the facts of the present case and the law as it existed at the time Julian Colby sought to obtain a cable television franchise, we conclude this may be a case where the existence of an equitable estoppel or laches should be recognized. We reach this conclusion for several reasons.

First, this case does not involve the unauthorized expenditure of taxpayers' money as did *Mazac, supra,* and *Hamer, supra.* Nor can it be said that the limitations on governmental authority in the area of cable

television regulation were clear and unambiguous in 1971 so as to preclude estoppel as a matter of law. Perhaps the most difficult legal question in this lawsuit is whether cable television was a "public utility" in 1971 within the purview of IC 18–1–21–5, and, therefore, whether Colby Cablevision Corporation was required to first enter into a contract with the Hammond Board of Public Works and Safety before passage of the franchise ordinance by the Common Council.[8] While we are not asked to decide this question, we are in a position to note the unsettled state of the law in 1971 with regard to cable television franchising. For instance, United points to the fact that if cable television is considered a public utility under IC 18–1–21–5, then cable television companies must also be vested with the power of eminent domain under a related section of the Cities and Towns Act of 1905, specifically IC 18–1–21–8. The Attorney General, in a 1965 opinion concerning regulation of cable television, stated:

> "At the outset, I wish to say that this Opinion represents the views produced by considerable research but in which I readily state there can be no great clarity, because CATV is a 'wild animal' which present laws were not designed to control or regulate. It is only logical, therefore, that legislative action will of necessity occur in this field."

1965 Op.Ind.Att'y Gen. No. 75 at 390. The present case does not appear to present a situation where public officials and private parties acted contrary to well-defined statutory procedures. United's claim of estoppel cannot be dismissed by relying on the simplistic rationale that all persons are charged with notice of statutes which limit governmental authority. The parties *may have* relied in all good faith upon the franchise procedures which were followed. This is essentially a question of fact for the trial court to determine.

---

8. We note that cities in this state were not *expressly* authorized to regulate cable television prior to enactment of Acts of 1971, Public Law 250, IC 18–1–1.5–13 (since repealed effective September 1981). This section of the Code provided:

> "A city shall have power to:
>
>     *    \*    \*    \*    \*    \**
>
>   (b) Regulate, inspect, license, ... services ... furnished directly to the homes of the general public which shall include ... television signals ...."

Perhaps a more compelling reason to recognize the equitable defenses of laches and estoppel in the present case is that to do so may be consistent with the public interest. Cablevision's posture in this lawsuit is that of a private business challenging the validity of a public contract held by another. While Cablevision additionally claims to be the guardian of public rights, Cablevision's standing in this litigation is based solely upon alleged harm to its private business interests.[9] The City of Hammond, which we presume continues to act in the best interests of the community, has not challenged the United franchise. The City will in fact receive 4% of United's gross revenue. Cablevision does not argue that it or any other competitor was excluded from the City's franchise negotiations in 1971, nor does Cablevision allege any other substantial harm to the public resulting from the procedural error claimed to be fatal to the 1971 Colby ordinance. If the requisite elements of estoppel or laches are established, then invalidating United's franchise would not only work a great hardship upon United, but might delay further the public's access to cable television in the Hammond area and the accompanying 4% franchise fee to the City.

Whether the elements of estoppel or laches are present in this case, and whether recognition of these defenses would be contrary to or consistent with the interests of the citizens of Hammond, ultimately remain as questions of fact for the trial court. We caution the court to consider both the equities and the public interest. Viewing the facts in a light most favorable to the decision below, we are unable to conclude the trial judge abused his discretion by denying Cablevision's request for preliminary injunctive relief and therefore affirm the trial court's actions.

YOUNG, P. J., and MILLER, J., concur.

---

**9.** Defendants cite the early case of *United States v. Beebe* (1887) 127 U.S. 338, 8 S.Ct. 1083, 32 L.Ed. 121, in support of the proposition that when a private individual sues to invalidate a public contract or franchise held by another, ostensibly to protect the public interest, but actually to serve his own private interests, the defenses of estoppel and laches may be raised to defeat the claim. *Beebe* was a suit to set aside an invalid land patent brought by the United States on relation of a private person. The U. S. Supreme Court stated:

"The principle that the United States are not bound ... by any laches of their officers, however gross, in a suit brought by them as a sovereign government to enforce a public right or to assert a public interest, is established past all controversy .... We are of the opinion that when the government is a mere formal complainant in a suit, ... merely to form a conduit through whom one private person can conduct litigation against another private person, a court of equity will not be restrained from administering the equities existing between the real parties ...." *Id.* at 344, 8 S.Ct. at 1086. *Beebe* was recognized and applied as the law of this state in the early Indiana Supreme Court case, *State ex rel. Goodman v. Halter*, (1897) 149 Ind. 292, 47 N.E. 665.