Patricia K. HENDERSHOT, M.D., Appellant–Defendant,

v.

INDIANA MEDICAL NETWORK, INC., Appellee–Plaintiff.

No. 49A02–0007–CV–442.

Court of Appeals of Indiana.

May 29, 2001.

Donald J. Tribbett, Starr Austen Tribbett & Myers, Logansport, IN, Rodger K. Hendershot, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Appellant.

Matthew W. Foster, Michael B. McMains, McMains Foster Jinks Morse &

Reddington, P.C., Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROOK, Judge.

### Case Summary

Appellant-defendant Patricia K. Hendershot, M.D. ("Hendershot") appeals the trial court's order granting summary judgment in favor of appellee-plaintiff Indiana Medical Network, Inc. ("IMN"). We reverse.[1]

### Issues [2]

We restate the various issues presented for our review as follows:

I. whether genuine issues of material fact precluding summary judgment exist regarding whether IMN breached the employment agreement (the "Agreement") before Hendershot terminated the Agreement; and

II. whether Hendershot waived, or is estopped from asserting, any defense by her acceptance of benefits under the Agreement.

### Facts and Procedural History

The facts most favorable to Hendershot are that she is a physician specializing in internal medicine. On December 30, 1993, Hendershot entered into the Agreement with Aegis Medical Clinic, Inc. ("Aegis") to work as a physician for a seven-year term, beginning on January 1, 1994, at 8091 Township Line Road (the "Clinic") "or at such other locations as agreed upon by the Parties." Record at 156. Regarding compensation, the Agreement provided that

for the first three years, Hendershot would be compensated at the greater of $134,874 or 50% of her cash collections. A separate provision of the Agreement governed her compensation during the remainder of the seven-year term.

The Agreement contained the following provisions regarding termination:

[T]his agreement may be terminated as follows:

(a) At any time during this Agreement, Aegis or Physician may terminate this Agreement for cause, as hereinafter indicated. "Cause" as used herein and the notice required to terminate shall be as follows:

(i) Failure of any party to comply with the terms and/or conditions of this Agreement or failure of the party in breach to cure any material breach of this Agreement within thirty (30) days after written notice of the breach provided by the nonbreaching party;

. . .

(v) After best efforts by Aegis and Physician to reach a mutually acceptable solution, failure of Physician, other than by reason of Physician's permanent disability to maintain the Full Time Practice of Medicine . . .

(3) The parties agree that the termination of this Agreement by either Aegis or the Physician prior to its expiration without good cause shall constitute a breach of the Agreement. The parties further agree that the injury which would result from such a breach would be significant, but that the damages therefrom would be difficult to compute.

---

1. We commend counsel for their excellent preparation for and presentations during the May 16, 2001 oral argument of this case.

2. Hendershot also takes issue with a section of IMN's brief entitled, "Preliminary Statement." This section, which is essentially argument devoid of record cites or authority, is not provided for by either the new or the old appellate rules.

Therefore, unless otherwise mutually agreed upon, Aegis and Physician agree that liquidated damages for the early termination of this Agreement without good cause during the initial term and any renewal term shall be equal to one-half of Physician's salary in the twelve months prior to the breach to be paid by the party in breach to the non-breaching party.

Record at 136–37, 139.

The Agreement's noncompete clause stated:

During the term of this Agreement, including any renewal terms and for a period of one (1) year after this Agreement terminates, Physician agrees that he/she will not provide professional services or take employment, ownership, or a position with comparable duties and responsibilities with a medical practice, hospital, health care delivery system or organization (hereinafter "Health Care Entity") located in Marion County, its contiguous counties or the county in which the Clinic and/or Facility ("Service Area") without the prior written consent of Aegis.

a) This covenant not to compete shall be given effect after the termination of this Agreement only in the event of:

i) termination of this Agreement due to Physician's breach of this Agreement prior to its expiration; or

ii) Aegis seeking to renew or extend the Agreement with compensation offered to Physician at the then fair market value for an internal medicine physician in the Indianapolis market place and Physician electing to terminate the Agreement or have it not automatically renewed;

2) The parties further agree that Physician shall have access to trade and business secrets and other confidential and proprietary information concerning Aegis and its related entities, shall have access to Aegis customers, and that the economic injury which would result to Aegis from Physician's breach of this covenant not to compete would be significant, but that the damages arising therefrom would be difficult to compute. Therefore, Aegis and Physician each individually agree that liquidated damages shall be paid by Physician to Aegis in the event that Physician breaches this covenant not to compete. Liquidated damages for Physician's breach of this covenant not to compete shall be equal to Fifty Thousand Dollars ($50,000) less 10% of said $50,000 for each twelve (12) month period of this Agreement which Physician shall have completed without breach of Physician's obligations outlined in this Agreement until the end of the fifth year of this Agreement when the liquidated damages shall total and remain at $25,000 for the original and any renewal terms and for a period of one (1) year after this Agreement terminates. There will be credit given under this formula only for those full 12 month increments during which Physician fulfilled his/her obligations hereunder. No credit will be given for partial periods of time. This liquidated damages provision and the obligations associated with the noncompete agreement shall survive the termination and/or expiration of this Agreement. The parties agree that the purpose of this provision is to prevent Physician from using trade or business secrets and other confidential knowledge of Aegis and to prevent Physician from enticing away patients.

Record at 146–48.

The Agreement included the following waiver provision:

No consent or waiver, express or implied, by any party to any breach or default by any other party in the perfor-

mance of obligations hereunder shall be deemed or construed to be a consent or waiver to any other breach or default in the performance of other obligations of such other party. Failure on the part of any party to declare any other party in default, irrespective of how long such failure continues, shall not constitute consent or waiver of the rights of such party. Record at 144–46. The Agreement could be amended "at any time by mutual agreement of the parties hereto by written amendment signed by each party, but [could not] be modified in any other manner." Record at 142.

As permitted in the Agreement, Aegis assigned its interest to IMN on January 1, 1995. In either late June or early July of 1997, IMN informed Hendershot that it was closing the Clinic on Township Line Road at which she had practiced with other physicians. Hendershot told IMN that she did not agree with the closure of the Clinic. IMN informed her that she would be given three weeks to decide among the following options:

1) remain at the Clinic location, where she could operate the office by herself and independent of IMN;

2) move her practice north to an IMN location in Carmel;

3) move her practice west to IMN's Eagle–Highlands office; or

4) split her time between the north and west offices.

In the late summer of 1997, Hendershot "initially considered continuing" her employment with IMN. However, the available offices were not preferable locations. In mid-August 1997, Hendershot was presented with an opportunity to join Nasser Smith & Pinkerton Cardiology, Inc. ("Nasser Smith"), a group in close proximity to the Clinic's location. In late August or early September, Hendershot helped IMN draft a letter to her patients regarding her relocation to the north and west offices. Although Hendershot's signature appears on the relocation letter that was eventually sent to her patients in September 1997, she did not sign the original letter that was ultimately copied and mailed.

IMN sent a letter accompanied by a Second Amendment to Physician Employment Agreement ("Amendment"), dated August 19, 1997, but not received by Hendershot until early September 1997. This Amendment presented for the first time a new compensation formula and also contained a proposal to change the location of Hendershot's office. The new compensation formula appeared to be based upon factors not mentioned in the original Agreement and would have resulted in a reduction of Hendershot's pay retroactive to January 1, 1997. IMN requested that Hendershot sign and return the Amendment by September 2, 1997; she never did.

In mid-September, Hendershot notified an IMN doctor in person and by phone that she would be terminating her employment with IMN for cause. Specifically, Hendershot stated that she believed IMN had breached the Agreement by failing to provide a mutually agreeable location and by failing to establish a relative value compensation formula by the November 1, 1996 Agreement deadline. In a September 24, 1997 letter, Hendershot provided IMN with detailed notice of her termination for cause. IMN closed the Clinic on October 3, 1997. Ten days later, Hendershot began working at Nasser Smith.

On November 5, 1997, IMN filed a complaint, which alleged that Hendershot had breached the noncompete provision of the Agreement by resigning her employment with IMN and requested injunctive relief and damages. In her answer, Hendershot denied most of the allegations of the com-

plaint, specifically denied that she had breached any agreement with IMN, and asserted the affirmative defense that IMN had breached the Agreement on numerous occasions prior to her resignation. She further argued that she terminated the Agreement for good cause and that by its breaches, IMN had waived its right to assert breach of contract claims against Hendershot.

On March 24, 1999, IMN filed a motion for summary judgment, alleging that Hendershot owed it liquidated damages because she had breached the Agreement by leaving IMN's employment and had breached the noncompete provision by going to work for Nasser Smith. In her response, Hendershot argued that she could not be held liable under the Agreement because it had been terminated for good cause, that is, IMN's failure to comply with certain terms and conditions of the Agreement. IMN replied that Hendershot did not have good cause to terminate the Agreement.

After holding oral argument and receiving various supplemental memoranda, the court granted summary judgment to IMN on May 30, 2000. In its order, which required Hendershot to pay IMN $99,816.15 plus pre-judgment interest, the court stated:

1. There is no genuine dispute on any material issue of fact, and [IMN] is entitled to judgment as a matter of law.
2. [IMN] is entitled to summary judgment on its claim that [Hendershot] breached [the Agreement] and the noncompete provisions contained therein.
3. [IMN] is entitled to summary judgment on its claim for liquidated damages

as computed under section 5(3) and 18(1)(2) of the Agreement, which damages are reasonable, appropriate and not punitive.

Record at 305–06.

## Discussion and Decision

### I. Genuine Issues of Material Fact

Hendershot does not challenge the validity of the noncompete provision of the Agreement.[3] Rather, she asserts that the record contains designated evidence and inferences that IMN breached the Agreement *before* Hendershot terminated the Agreement. Specifically, Hendershot argues that there was evidence that IMN violated the Agreement's provisions regarding practice location, timely development and implementation of a relative value formula for compensation, and proper payment. Hendershot contends that these breaches should have precluded summary judgment against her for her resignation.

When reviewing a grant or denial of summary judgment our well-settled standard of review is the same as it was for the trial court: whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. Summary judgment should be granted only if the evidence sanctioned by Ind. Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law. The granting of a motion for summary judgment is inappropriate if the trial court must weigh conflicting evidence to reach a decision. The appellant bears the burden of proving that the trial court erred in determining that

---

**3.** Thus, it is surprising that IMN spends a considerable portion of its brief discussing the reasonableness of its noncompete provision. "Assuming that [IMN] was in full compliance, had Hendershot sought to terminate the Agreement and seek other employment, the noncompete would, in all likelihood, have been enforceable, and Hendershot has made no assertion to the contrary. However, that is not at all the case." Reply brief at 7–8.

there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

*Sallee v. Mason,* 714 N.E.2d 757, 760–61 (Ind.Ct.App.1999) (citations omitted), *trans. denied.* Moreover, we construe the pleadings, affidavits, and designated materials in a light most favorable to the non-movant and give careful scrutiny to assure that the losing party is not improperly prevented from having her day in court. *Miller v. Memorial Hosp. of South Bend,* 679 N.E.2d 1329, 1330 (Ind.1997).

Generally, construction of a written contract is a question of law for the trial court for which summary judgment is particularly appropriate. Whenever summary judgment is granted based upon the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or that the contract ambiguity, if one exists, can be resolved without the aid of a factual determination.

*GDC Envtl. Servs., Inc. v. Ransbottom Landfill,* 740 N.E.2d 1254, 1259–60 (Ind. Ct.App.2000) (citation omitted). Yet, whether an act constitutes a termination of an agreement, and thus is a breach thereof, is often a question of fact, making summary judgment inappropriate. *van de Leuv v. Methodist Hosp. of Indiana, Inc.,* 642 N.E.2d 531, 533 (Ind.Ct.App.1994); *see also Rogier v. Am. Testing and Eng'g Corp.,* 734 N.E.2d 606, 621 (Ind.Ct.App. 2000), *trans. denied; Anderson v. Horizon Homes, Inc.,* 644 N.E.2d 1281, 1290 (Ind. Ct.App.1995), *trans. denied; Tomahawk Vill. Apts. v. Farren,* 571 N.E.2d 1286, 1293 (Ind.Ct.App.1991).

Here, according to the Agreement, the liquidated damages provision could only be enforced if the trial court determined that Hendershot's termination of the Agreement was without good cause. Since the Agreement defines cause as "failure of any party to comply with the terms and/or conditions of this Agreement ...," the court would also have had to find that IMN was in full compliance with the Agreement's terms in order to find that Hendershot breached. Indeed, IMN admitted at one point that it "has never disputed that an employer's prior material breach will discharge an employee's obligation to follow an agreement's non-compete clause[.]" Record at 284. Thus, we examine whether there was any designated evidence or inferences that IMN breached the Agreement before Hendershot terminated her employment and went to work for Nasser Smith.

### A. Change in Office Location

■ In her deposition, Hendershot testified that IMN informed her on approximately July 3, 1997, that it was closing the Clinic and offering her a choice among four options for physicians. She registered her displeasure with IMN's decision. Hendershot does not dispute that she discussed the four alternatives with IMN or that she provided input for the relocation letter to her patients. However, she does dispute that the parties "agreed upon" the relocation decision. Likewise, she disputes that she signed the final relocation letter. Moreover, she points to the provision stating that the Agreement could be amended "at any time *by mutual agreement* of the parties hereto *by written amendment signed by each party,* but [could not] be modified in any other manner." (Emphases added). Although IMN sent Hendershot the Amendment, which set forth the relocation, Hendershot never signed it. In addition, Hendershot contends that other doctors told her that the renovations done to the Eagle–Highlands office were not done to accommodate her needs, but to improve traffic flow.

IMN's version of the relevant events, as told primarily through its president's affidavit and the affidavit of the IMN practice manager, is as follows. Economic necessity forced the closing of the Clinic. Hendershot chose to split her time at the Carmel and Eagle–Highlands offices. To that end, she worked actively with IMN to make the transition a smooth one, even editing and approving the relocation letter. For its part, IMN spent money renovating one of the offices in anticipation of her arrival. The Agreement did not require Hendershot's assent prior to relocating. Her conduct, indicating her assent thereafter, was sufficient. Hendershot simply chose to retract her agreement when Nasser Smith presented a more attractive offer.

While at one time there may have been a difference of opinion regarding whether Hendershot agreed to the change of location, there is undisputed evidence that Hendershot eventually went along with it. That is, although Hendershot attempts to recharacterize her conduct and assert that she did not actually agree to the move, her actions indicate otherwise. Indeed, her actions demonstrate tacit approval of the change in office location. Thus, we cannot say now that there is a *genuine* issue of material fact.

### B. Timely Development and Implementation of Relative Value Formula for Compensation

■ The Agreement provided the following provisions regarding the latter part of the seven-year term:

C. During the initial three (3) year period, Aegis or its assigns *shall develop a new compensation schedule for physicians which will be based on a relative value formula taking into account such factors as* clinical effort, efficiency, use of personnel and resources by Physician, patient satisfaction, outcome measurement, administrative effort, research, education, indigent care, development of and compliance with care protocols, and such other criteria as may be approved by the Aegis Board. Clinical effort will include physician activity such as medical directorships, rehabilitation hospital staff work, medical speaking or consulting engagements, medical committee or panel duties, etc. *Such relative value compensation formula is to be developed for approval by the Aegis Board no later than November 1, 1996.*

D. *Starting January 1, 1997, Physician's compensation for the remainder of the term of this Agreement shall be revised based on the new relative value, taking into account then current market compensation.* Physician's compensation after January 1, 1997 shall not be less than Seventy–Five Percent (75%) of his/her minimum guaranteed amount.

Record at 152–53 (emphases added).

In a letter dated August 19, 1997, to Hendershot, IMN stated:

*Approximately a year ago,* we individually reviewed a two (2) year compensation proposal. *A compensation figure was set on historical gross production, hospital visits, ambulatory visits and net revenue . . . .*

Unfortunately, our accompanying amendment was delayed in the Clarian Legal Department which resulted in this late publication. I apologize that you didn't receive it earlier. I would propose that this amendment should carry us to the end of Internal Medicine's seven (7) year contract. . . .

Please find enclosed for your review and signature the Second Amendment addressing the change in your compensation (effective January 1, 1997) and the practice location change discussed and agreed to mutually. If you find the

Amendment complete, please sign and return ... by September 2, 1997.

Record at 170.

Hendershot's assertion that IMN breached the agreement regarding the relative value formula actually consists of three sub-issues. Did IMN develop the new compensation proposal before the November 1, 1996 deadline? Did IMN revise Hendershot's compensation based on the new formula by the January 1, 1997 deadline? Did IMN use improper factors in designing its new compensation formula?

One can infer from the August 19, 1997 letter that IMN had developed the compensation proposal before the November 1, 1996 deadline, but that its approval and implementation was delayed by the Clarian Legal Department. No evidence to the contrary exists. As for the second query, considering that the letter outlining the new compensation formula was not mailed until late August 1997, IMN clearly failed to meet the January 1, 1997 Agreement deadline for revising Hendershot's compensation for the remainder of the seven-year period. That the August 1997 Amendment attempted to implement a retroactive change in the compensation does not alter the reality that as of January 1, 1997, Hendershot's compensation was not revised. Hence, a strong argument for a breach exists. As for the third sub-issue, while the new formula does not seem to be comprised of the factors set forth in the Agreement, the Agreement's language was not mandatory in certain respects. In particular, the Agreement required that the new compensation schedule "will be based on a relative value formula," but included the language "taking into account such factors as" as well as "and such other criteria as may be approved by the Aegis Board," hence implying that the Agreement provided a nonexhaustive list of factors that could be included in the formula.

Accordingly, that the new compensation figure was "set on historical gross production, hospital visits, ambulatory visits and net revenue" is not necessarily a violation of the Agreement.

Viewing the facts most favorable to Hendershot, the nonmoving party, we conclude that genuine issues of material fact exist—at least about the second question, which preclude summary judgment.

### C. Proper Payment

■ The Agreement contained the following provisions regarding payment during the first three years of the seven-year term:

A. For engaging in the Full Time Practice of Medicine as set forth in this Exhibit, Physician shall be paid annually for the first three (3) years of this Agreement the following:

The greater of $134,874 (base salary or minimum guaranteed amount) or 50% of cash collections attributed to Physician's activity with the Clinic.

B. Compensation will be paid monthly using the minimum guaranteed amount. After the close of business in November each year a calculation will be made to compare 50% of collections for the prior twelve (12) month period (December 1 of the preceding year through November 30 of the current year) with the minimum guaranteed amount. If fifty percent (50%) of collections is higher, a salary adjustment will occur in December each year. In order to continue to receive the compensation stated herein, Physician agrees to continue to practice medicine and make himself/herself available for hours of patient care services at a level consistent with Physician's past hours, scope and productivity and also consistent with standards applicable to Internal Medicine, professional patient care and productivity standards estab-

lished by Aegis and the Medical Director of the Internal Medicine Division.

Record at 152.

IMN designated the affidavit of its chief operating officer, which stated:

3. Dr. Hendershot was scheduled to make $121,387.00 for calendar year 1997 based upon the IMN Compensation Formula effective January 1, 1997.

. . . .

6. At no time during the term of Dr. Hendershot's Physician Employment Agreement effective January 1, 1994, did 50% of Dr. Hendershot's cash collections exceed $134,874.00.

7. Based upon the Medical Group management Association ("MGMA") figures for multi-specialty medical groups similar to IMN, on a national average, the "net collection rate" of gross collections (gross collections = total amount billed minus binding contractual write-offs) for physicians for 1994 was 96.0%; for 1995 was 96.30%; for 1996 was 95.70% and for 1997 was 95.50%. IMN's net collection rate for Dr. Hendershot for 1994 was 95.73%; for 1995 was 97.91%; for 1996 was 92.40%, and; for 1997 was 94.0%.

8. From January 1, 1994, until October 6, 1997, Dr. Hendershot generated fees in the amount of $1,184,146.75 in gross revenues.

9. For calendar year 1996, Dr. Hendershot earned $139,104.85.

10. For the 12 months prior to Dr. Hendershot's unilateral termination of the Agreement on or about October 6,

1997, Dr. Hendershot earned compensation in the amount of $129,722.30.

Record at 203–04.

In an affirmative defense and now on appeal, Hendershot argues that IMN's inadequate recordkeeping[4] may have led to her being undercompensated. Specifically, she argues that she produced average annual gross revenues of $314,375.28.[5] She contends that, even multiplying $314,375.28 by her lowest stated collection rate (92.4%) and then multiplying that number by 50% as per the Agreement, Hendershot averaged $145,241.38 in cash collections. This is in contrast to IMN's chief operating officer's affidavit statement that at "no time during the term of Dr. Hendershot's Physician Employment Agreement effective January 1, 1994, did 50% of Dr. Hendershot's cash collections exceed $134,874.00."

IMN points out that Hendershot improperly uses post-January 1, 1997 numbers in her calculations. Hendershot responds that she did not have a choice in view of the limited information provided by IMN. Hendershot admits that it is "possible, although not likely, that Hendershot's cash collections for 1997 were so disproportionately high as to throw off the entire calculation." Reply brief at 23. However, Hendershot maintains that when viewing the inferences from the numbers provided by IMN in the light most favorable to her, "it appears that, at some point, Hendershot was underpaid" by IMN and that IMN was, therefore, in breach of the Agreement. *Id.*

---

4. For instance, Hendershot asserts that IMN did not keep sufficiently detailed records and failed to bill some of Hendershot's patients. She also notes that for the first quarter of 1997, IMN's production reports for both Hendershot and one of her colleagues "were identical—a virtual impossibility." Appellant's brief at 12.

5. $1,184,146.75 total gross revenues divided by 45 ½ months worked, and then multiplied by 12, equals $314,375.28.

■ Again, viewing the facts most favorable to Hendershot, as we must, we conclude that genuine issues of material fact about the third issue exist, thereby making summary judgment inappropriate. Although IMN's version of the events may seem more plausible than Hendershot's, summary judgment "is not a procedural device to be used to avoid weak claims." *Campbell v. Railroadmen's Fed. Sav. and Loan Ass'n of Indianapolis,* 443 N.E.2d 81, 84 (Ind.Ct.App.1982); *see also Yin v. Soc'y Nat'l Bank Indiana,* 665 N.E.2d 58, 65 (Ind.Ct.App.1996), *trans. denied.* To reiterate, summary judgment should be granted

> only if the evidence sanctioned by Ind. Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law. The granting of a motion for summary judgment is inappropriate if the trial court must weigh conflicting evidence to reach a decision. It is for the factfinder to weigh conflicting evidence.

*Sallee,* 714 N.E.2d at 760–61 (citations omitted).

### II. Waiver or Estoppel

■ IMN argues[6] that Hendershot "has waived or is estopped to challenge enforceability of any provision of the Agreement, including specifically the noncompete provision." Appellee's brief at 22. IMN urges that Hendershot was aware of the noncompete clause and worked under it from January 1994 to October 6, 1997. IMN contends that only after deciding to terminate her employment and after accepting the Agreement's benefits for more than three and one-half years "did Hendershot ever raise questions about enforcement or validity of the Agreement and its noncompete provision." *Id.* at 23. IMN asserts that under *Raymundo v. Hammond Clinic Ass'n,* 449 N.E.2d 276 (Ind. 1983), a party cannot claim the benefits under a transaction or instrument and, at the same time, repudiate its obligations.

■ Keeping in mind the previously stated summary judgment standard of review, we also note that "the existence of facts necessary to constitute waiver is ordinarily a question of fact[.]" *Pohle v. Cheatham,* 724 N.E.2d 655, 658 (Ind.Ct. App.2000) (clarifying that when only the inferences and legal conclusions to be drawn from the agreed upon facts are argued, the question of waiver is proper for the court to consider as a matter of law on summary judgment); *see also Cablevision of Chicago v. Colby Cable Corp.,* 417 N.E.2d 348, 357 (Ind.Ct.App.1981) (holding that estoppel was a question of fact).

Again, the Agreement included the following waiver provision:

> No consent or waiver, express or implied, by any party to any breach or default by any other party in the performance of obligations hereunder shall be deemed or construed to be a consent or waiver to any other breach or default in the performance of other obligations of such other party. *Failure on the part of any party to declare any other party in default, irrespective of how long such failure continues, shall not constitute consent or waiver of the rights of such party.*

Record at 144–46 (emphasis added).

In *Raymundo,* a physician and a clinic entered into a five-year employment

---

**6.** IMN also spends a section of its brief justifying the amount of the trial court's award. However, Hendershot "has not challenged the trial court's calculation of damages if a breach 'were first shown. Accordingly, the calculation of damages is not an issue, and Hendershot does not respond to [IMN's] argument related thereto." Reply brief at 26.

agreement containing a noncompete provision. Raymundo worked under the agreement for two and one-half years and then repudiated the agreement, but hoped to avoid application of the noncompete clause. Unlike the present case, there was no allegation that the *Raymundo* agreement contained a "no waiver/consent to breach" provision. Further, Raymundo argued duress from the outset of the agreement, but failed to provide a factual basis to establish his claim. Here, in contrast, Hendershot learned of the Clinic's alleged breaches very shortly before she terminated the Agreement, and disputed evidence exists to support the claimed breaches. As such, summary judgment was inappropriate.

Reversed.

ROBB and VAIDIK, JJ., concur.