**NATIONAL SALVAGE & SERVICE CORPORATION, Appellant (Defendant Below),**

v.

**COMMISSIONER OF THE INDIANA DEPARTMENT OF ENVIRONMEN-TAL MANAGEMENT, Appellee (Plaintiff Below).**

No. 49A04–8912–CV–554.

Court of Appeals of Indiana, Fourth District.

May 15, 1991.

George M. Plews, Sue A. Shadley, Peter M. Racher, Pendygraft Plews & Shadley, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Michael Schaeffer, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

MILLER, Judge.

National Salvage (Salvage) leased a warehouse in an Indianapolis industrial park in order to transfer, under contract,

bailed solid municipal waste (all from out of state) from railroad cars through its warehouse onto trucks, which then took the waste to a landfill in Boone County, Indiana. The railroad cars contained large amounts of waste and often were not unloaded for several days. Salvage never obtained a solid waste permit from the Indiana Department of Environmental Management (Department). On October 27, 1989, the Department filed a complaint in the Marion Circuit Court, seeking a preliminary and permanent injunction against Salvage's operation. Salvage appeals the November 16, 1989, granting of a preliminary injunction against it, raising six issues which we rephrase as follows:

I. Whether Salvage's warehouse, served by a railroad spur which receives boxcars containing municipal waste, is a facility for which a solid waste facility permit is required.

II. Whether construing the statutes and regulations to require Salvage to obtain a permit makes these laws unconstitutionally vague.

III. Whether the Department was estopped from requiring a permit due to an unwitnessed and unmemorialized meeting between a Salvage officer and a Department employee, at which the Salvage representative was allegedly told no permit was required.

IV. Whether the Department met the requirements for injunctive relief without a balancing of the equities and without a showing of irreparable harm, but on a showing of Salvage's violation of the statutory and regulatory schemes.

V. Whether the trial court erred because it did not consider or find that the Department's efforts to block Salvage's off-loading operation by requiring a permit violated the Commerce Clause of the United States Constitution.

VI. Whether the Department's regulatory requirements are preempted by federal law and whether the trial court lacked subject matter jurisdiction.

We affirm.

## FACTS

The facts most favorable to the trial court's decision reveal that on October 23, 1989, the Commissioner of the Department, Kathy Prosser, sent investigator Robert Cline to Salvage's warehouse. Mr. Cline observed five railroad boxcars sitting at Salvage's warehouse siding. The door was ajar on one boxcar and he observed garbage in it. Cline observed some of the cars emitting some sort of liquid and strong odors. He said it smelled like a dump. Flies were also present. The boxcars were still present the following day.

Before the issuance of a Temporary Restraining Order on October 27, 1989, Salvage had actually received at least twelve waste-filled boxcars at the warehouse between October 13 and 19. Only one of these cars was unloaded the same day it arrived. Most of the cars remained at least two days and, in some cases, cars remained on the tracks alongside Salvage's premises for three days. The boxcars held between 70–95 tons of municipal waste each.

In February, 1989, Curtis Schopp, vice-president of Salvage, met with C. Steven Poe, Chief of the Facility Inspection Section of the Department for Southern Indiana, to whom a receptionist had referred Schopp in response to Schopp's statement that he had a solid waste question. No one under the deputy commissioner level at the Department has authority to make decisions regarding permits. Schopp testified that, in this unwitnessed unmemorialized impromptu meeting, he explained the details of the proposed operation without the benefit of plans or diagrams. Schopp alleges that Poe orally informed him that no permit would be required for the operation Schopp outlined. Schopp claims that they proceeded with their plans for the boxcar unloading operation in reliance upon this conversation.

In order to support Mr. Schopp's claim, Salvage called two witness, Mr. Tucker Lamkin and Mr. John Miller, who were interested in starting businesses similar to Salvage's. In April and again in May, Mr. Lamkin and Mr. Miller also inquired of the Department concerning a similar use of boxcars. Although Mr. Miller and Mr.

Lamkin believed it was Mr. Poe's opinion that their projects would not require a permit, their projects did not proceed. There is no evidence that Schopp, Miller or Lamkin had any contemporaneous knowledge of each other's conversations with the Department.

In meetings with the Indiana Railroad Company in June of 1989, Christa Russell, Mr. Poe's superior, told it permits were required for "off-loading" facilities. Ms. Russell also told this to a representative of a company called Crossbridge which owned some of the cars which were present at Salvage when the site was investigated on October 23, 1989. The record does not indicate whether Crossbridge communicated this to Salvage.

Additional facts will be added as necessary. The trial court made the following Findings of Fact and Conclusions of Law:

1. The Indiana Department of Environmental Management (hereinafter referred to as Department) is an administrative agency of the State of Indiana which is organized, established and existing by virtue of IC 13-7-2-11.

2. The Environmental Management Act, IC 13-7-5-7, authorizes court actions by the Commissioner of the Indiana Department of Environmental Management Act to seek injunctive relief to procure compliance with said Act.

3. The defendant is an Indiana corporation and was incorporated on January 13, 1988.

4. On or about July 31, 1989 the defendant entered into a lease of the premises referred to as 1931 Stout Field Drive in Indianapolis, Indiana.

5. Prior to this in June the defendant had placed an ad in a trade publication for the receipt and disposable [sic] of both loose and solid waste.

6. Curtis Schopp, the vice-president of National Salvage had visited the offices of the Department sometime in February, 1989 prior to the commencement of operations. He had gone to the Department to inquire about both the disposal of special and solid waste. While there he had a visit with a Mr. Poe and testified that he explained the operation to Poe and was informed orally that no permit was required. No written confirmation of this was ever obtained.

7. National Salvage places great reliance on this oral opinion.

8. The leased premises is served by a railroad spur line and facing the railroad tracks on one wall are two doors [through] which the contents of a railroad car may be brought into the building. There is no permitted landfill or other disposal facility at these premises.

9. On or about August 9, 1989 the defendant entered into an agreement under which it would dump waste material at the Northside Landfill in Boone County.

10. On or about September 8, 1989 the defendant entered into a lease for three Dorsey "open top/walking floor" trailers.

11. On or about October 6, 1989 the defendant entered into a master lease agreement for three Mack trucks.

12. On or about October 11, 1989 the defendant entered into a lease for up to 120 60-foot boxcars numbered NSSX 5000 through NSSX 5119.

13. Between the dates of October 13, 1989 and October 19, 1989 at least twelve (12) railroad boxcars were placed at the defendant's leased premises, solid waste was unloaded into defendant's building and put into truck trailers. Once placed on the abutting siding the railroad cars waited from one to three days for unloading.

14. Each of these railroad boxcars contained baled municipal solid waste.

15. The basic business of the defendant was to transfer bales of solid waste from the railroad cars to their warehouse. Such waste would then be loaded on trucks to be taken to the Northside Landfill. It would take about three and one half truck loads of material to unload one railroad car.

16. Operation would be accomplished by bringing the railroad car to the side of the building where forklift trucks would unload it into the warehouse and then

would place it in trucks for transport to the landfill.

17. Defendant also has an agreement with Star Recycling Company under which the defendant would receive unrecyclable material from Star Recycling. This material included what is commonly known as garbage.

18. On October 23, 1989 five (5) railroad boxcars loaded with solid waste were observed at the defendant's facility. Some of these cars were observed emitting a liquid of some sort.

19. Railroad boxcars originating from Star Recycling and on which the NSSX registration numbers were visible were observed on October 27, 1989 on a railroad siding between Minnesota Street and Airport Expressway next to the Bridgeport Brass Company. Again it was observed that each of these cars were emitting some sort of a liquid.

20. No test was ever performed on the liquid coming from said boxcars.

21. The plaintiff has never issued a solid waste facility permit of any kind for defendant's operations at 1931 Stout Field Drive.

22. The question presented is whether this type of operation requires the issuance of a permit by the Department under existing statutes and regulations.

23. The statutory requirements include IC 13–7–4–1(6) and IC 13–7–1–22 which provide in part as follows:

24. IC 13–7–4–1(6) provides as follows:

Sec. 1. No person may do any of the following: (1) Discharge, emit, cause, allow, or threaten to discharge, emit, cause, or allow any contaminant or waste including any noxious odor, either alone or in combination with contaminants from other sources, into the environment or into any publicly owned treatment works in any form which causes or would cause pollution which violates or would violate rules standards, or discharge or emission requirements adopted by the appropriate board pursuant to this article.

\* \* \* \* \* \*

(3) Deposit any contaminants upon the land in such place and manner which creates, or which would create, a pollution hazard that violates or would violate a rule adopted by one of the contaminants or solid waste upon the land except through the use of sanitary landfills, incineration, composting, garbage grinding, or another method acceptable to the solid waste management board.

(4) Dump, cause, or allow the open dumping of garbage or of any other solid waste in violation of rules adopted by the solid waste management board.

\* \* \* \* \* \*

(6) Construct, install, operate, conduct, or modify, without prior approval of the department, any equipment or facility of any type which may cause or contribute to pollution or which may be designed to prevent pollution. However, the commissioner or the appropriate board may approve experimental uses of equipment, facility, or pollution control device as is deemed necessary for the further development of the state of the art of pollution control.

25. IC 13–7–1–22 provides as follows:
"Solid waste" means any garbage, refuse, sludge from a waste treatment plant, sludge from a water supply treatment plant, sludge from an air pollution control facility, or other discarded material, including solid, liquid, semisolid, or commercial, mining, or agricultural operations or from community activities.

26. Pertinent regulations include 329 IAC 2–2–1(a)(53), 329 IAC 2–2–1(a)(41) and 329 IAC 2–3–1(6) the latter [sic] containing the only relevant exclusion of regulation in this matter and such regulations are as follows:

27. 329 IAC 2–2–1(a)(53) defines the term "solid waste facility" as used above, as follows:

(53) "Solid waste facility" or "facility" means all contiguous land and structures, other appurtenances, and improvements on the land, used for pro-

cessing, storing in conjunction with processing or disposal, or disposing of solid waste, and may consist of several processing, storage, or disposal operational units, e.g., one or more landfills, surface impoundments, or combinations thereof.

28. 329 IAC 2–2–1(a)(41) defines the term "processing" as used above, as follows:

(41) "Processing" means the method, system, or other handling of solid waste so as to change its chemical, biological, or physical form or to render it more amenable for disposal or recovery of materials or energy, or the transfer of solid waste materials but excluding the transportation of solid waste.

29. 329 IAC 2–3–1(6) contains the only relevant exclusion to regulation in this matter and provides as follows:

The following solid waste management activities are not subject to the provisions of this article:

(6) Processing, except for incineration, of solid waste which takes place at the generating facility.

## CONCLUSIONS OF LAW

1. Actions based on oral representations, without written confirmation and approval, are open to conflicting interpretations and the authority of those making such statements. Placing full reliance on such oral expressions is to say the least hazardous and it is a practice which is not to be condoned.

2. The defendant's building an operation at 1931 Stout Field Drive constitutes a solid waste facility, as defined, because it is used for processing or storing. In conjunction with processing of solid waste by virtue of the handling of baled waste and the storing of such waste in railroad boxcars pending unloading and transfer to trucks for the transportation to a disposal site.

3. The defendant's operation constitutes processing of solid waste because a) it is the handling of solid waste so as to change its physical form, b) it renders the waste more amenable to disposal by virtue of reducing its mass, and c) it is a transfer of solid waste material from one container to another away from the point of generation.

4. The delivery, and acceptance, unloading, and transfer of solid waste at the defendant's facility thus constitutes a violation of the applicable statute and regulations.

5. While a civil penalty may be imposed the uncontroverted evidence that reliance was placed on the oral representations of Mr. Poe is a mitigating circumstance and no civil penalty is therefore imposed.

6. The plaintiff. is however entitled to injunctive relief under the facts of this case and the injunction is therefore granted.

7. The law is with the plaintiff and against the defendant and operations of this type must receive a permit from the Department.

(R.78–83).

## DECISION

*Issue I—Permit Requirement*

Salvage argues that no law or rule requires it to get a permit from the Department for off-loading baled municipal waste from railroad box cars to a warehouse and then immediately into trucks. Salvage also argues that if the current laws or rules are so construed, the law or rule is unconstitutionally vague. We disagree with these contentions.

Ind.Code 13–7–4–1 requires any facility which may cause pollution to get prior approval from the Department. IC 13–7–4–1 provides in pertinent part as follows:

"Sec. 1. *No person may* do any of the following:

\* \* \* \* \* \*

(6) *Construct, install, operate, conduct,* or modify, without prior approval of the department, *any equipment or facility of any type which may cause or contribute to pollution* or which may be designed to prevent pollution. However, the commissioner or the appropriate board may approve experimental uses of

equipment, facility, or pollution control device as is deemed necessary for the further development of the state of the art of pollution control."

(emphasis added.)

Salvage argues that this broad prohibition is the only authority which might possibly cover its activities and that this authority is unconstitutionally vague. This is incorrect. IC 13–7–10–1 gives rule-making authority to the Solid Waste Management Board (Board) and defines the scope of that authority. The Board has promulgated specific regulations which require operations such as Salvage's to obtain permits.

The Board's implementing rule, 329 IAC 2–8–1, states that solid waste permits are required for any person who disposes of solid waste or who operates a solid waste processing facility. In order to determine if Salvage is required to get a permit under the rule, we must look at the definitions section—329 IAC 2–2–1—to ascertain whether Salvage disposes of solid waste or operates a solid waste processing facility.

Neither party contends that Salvage comes under the definition of "Solid waste land disposal facility"—329 IAC 2–2–1(54). The question is whether, under 329 IAC 2–2–1, Salvage can be termed as a solid waste processing facility. The trial court found the applicable definitions in 329 IAC 2–2–1 to be as follows:

"(53) 'Solid waste facility' or 'facility' means all contiguous land and structures, other appurtenances, and improvements of the land, used for processing, storing in conjunction with processing or disposal operational units, e.g., one (1) or more landfills, surface impoundments, or combinations thereof.

"(41) 'Processing' means the method, system, or other handling of solid waste so as to change its chemical, biological, or physical form or to render it more amenable for disposal or recovery of materials or energy, or the transfer of solid waste materials but excluding the transportation of solid waste."

When these two definitions are examined in isolation, Salvage appears to be a "solid waste processing facility" which would be required to get a permit under 329 IAC 2–8–1. However, 329 IAC 2–2–1(55) is the operative definition because it specifically defines the term "solid waste processing facility" as follows:

"(55) 'Solid waste processing facility' means a solid waste facility upon which is located a solid waste incinerator, *transfer station,* solid waste baler, solid waste shredder, resource recovery system, composting facility, or garbage grinding facility." (Emphasis added).

Whether or not Salvage falls under the specific definition of "solid waste processing" hinges upon the definition of "transfer station". Arguably, Salvage's activities of off-loading from railroad cars to trucks meet the dictionary definition of transfer. However, "transfer station" is specifically defined in 329 IAC 2–2–1(58) as follows:

"(58) 'Transfer station' means a facility at which solid waste is transferred into larger capacity vehicles or containers for further transportation but shall not include neighborhood recycling collection centers or transfer activities at generating facilities."

It appears that Salvage's activities do not meet this definition because the solid waste is transferred into vehicles which have a smaller capacity than the railroad cars (the vehicles which brought the waste to the site). However, the definition is ambiguous and it could be construed as meaning vehicles which are larger than the facility. If a statute is ambiguous, the court is to interpret it "in order to ascertain and effectuate the general intent of the legislature". *Economy Oil Co. v. Indiana Dept. of State Revenue* (1974), 162 Ind.App. 658, 321 N.E.2d 215, 218. Furthermore, it cannot be presumed that the legislature intended to do an absurd thing. *Indianapolis Union R. Co. v. Waddington* (1907) 169 Ind. 448, 82 N.E. 1030. If the term "transfer station" were interpreted to only cover facilities at which trash was transferred from small vehicles to larger ones, there would be an absurd result. The railroad cars serve as collection depots and pose the same dangers.

The legislature clarified this ambiguity and sought to avoid absurd interpretations of the statute with the passage of P.L. 19–1990, Sec. 19 (after the onset of this litigation). 329 IAC 2–2–1(a) states that the definitions found in IC 13–7–1 apply throughout the article. P.L. 19–1990, Sec. 19 states:

"IC 13–7–1–24.5 IS ADDED TO THE INDIANA CODE AS A NEW SECTION TO READ AS FOLLOWS: Sec. 24.5. 'Transfer station' means a facility where solid waste is transferred from a vehicle or a container *to another vehicle or container for transportation.* The term does not include the following:

(1) A facility where the solid waste that is transferred has been generated by the facility.

(2) A recycling facility."

(emphasis added).

■■■ It is true that where the legislature amends a statute, it is presumed that it intended to change its meaning. *Lake County Beverage Company v. 21st Amendment* (1982), Ind.App., 441 N.E.2d 1008. However, this presumption "will not apply if it appears that the amendment was made only to express the original intention of the legislature more clearly". *Pike County v. State ex rel. Hardin* (1984), Ind.App., 469 N.E.2d 1188, 1194. The presumption is rebutted in the instant case. This new definition of transfer station was added to clear up the previous ambiguity and to avoid an absurd result. The following language in P.L. 19–1990, § 41, makes it clear that the additional language in the definition of the term "transfer station" is a clarification rather than a change in the law:

"SECTION 41. (a) IC 13–7–1–24.5 as added by this act, and IC 13–7–10–1(f), as added by this act, are clarifications only and should not be construed as modifications of existing law.

(b) IC 13–7–1–24.5 and IC 111(f) do not affect:

(1) rights or liabilities accrued;

(2) penalties incurred;

(3) violations committed; or

(4) legal proceedings commenced;

before the date IC 13–7–1–24.5 and IC 13–7–10–1(f) become effective."

This is not a retroactive application of a change but merely a clarification. We can use this clarification to ascertain the legislative intent. With this clarification of the term "transfer station", Salvage clearly comes under the definition of a "waste processing facility" because it is transferring solid waste from one vehicle or container (railroad cars) through its building to another vehicle or container (trucks) for transportation. Therefore, Salvage was required to get a permit under 329 IAC 2–8–1.

*Issue II—Vagueness of the Statutes and Regulations*

■■■ Salvage, in its reply brief, argues that the very fact that P.L. 19–1990, § 19, was necessary to clarify the ambiguities in the Board's regulations demonstrates that the regulations are unconstitutionally vague because they do not give fair warning to Salvage that it is a solid waste processing facility which is required to get a permit. The Board's regulations are not unconstitutionally vague. There is some ambiguity in the term transfer station. As noted earlier, this term is important because once it is ascertained that Salvage is a transfer station then it follows that it is a solid waste processing facility which is required to get a permit under 329 IAC 2–8–1.

In *Robinson v. United States* (1945), 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944, the Supreme Court stated that not all ambiguities in statutes negate fair notice and rise to the level of unconstitutional vagueness. In *Robinson,* the Court noted that "in most English words and phrases there lurk uncertainties." *Id.* at 286, 65 S.Ct. at 669.

■■■ Economic regulations, such as the one at issue here, are examined with less scrutiny than those that impose criminal penalties. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1981), 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362. There is a strong presumptive validity of legislation. *Van Sant v. State* (1988), Ind.App., 523 N.E.2d 229. Case law indi-

cates that the rules of statutory construction are used to save a statute from being unconstitutionally vague. *See, e.g., Van Sant, supra.*

In the case at bar, construing the Board's regulations to require Salvage to get a solid waste permit does not make the regulations unconstitutionally vague. As noted earlier, such an interpretation furthers the probable legislative intent and prevents an absurd result. Therefore, such a construction is in keeping with the rules of statutory construction, gives fair notice and is not unconstitutionally vague. *See Economy Oil, supra; Waldron v. McAtee,* 556 F.Supp. 101 (S.D.Ind.1983).

*Issue III—Estoppel*

Salvage next claims that Mr. Poe, Chief of the Facility Inspection Section of the Department for Southern Indiana, told Mr. Schopp of Salvage that a permit was not necessary and, therefore, the Department is estopped from requiring Salvage to close until a permit is obtained, even if a permit is required.

 Generally, reliance on misinformation provided by a government employee is not a basis for estoppel because the government could be precluded from functioning if it were bound by its employees' unauthorized representations. *See, e.g., Gressley v. Califano,* (7th Cir.1979), 609 F.2d 1265. Our courts are especially reluctant to apply equitable estoppel against the government "where the unauthorized acts of public officials somehow implicate government spending powers". *Cablevision of Chicago v. Colby Cable Corp.* (1981), 417 N.E.2d 348, 354; *Mazac v. City of Michigan City* (1934), 98 Ind.App. 366, 189 N.E. 400. Even if public spending is not involved, our courts are reluctant to apply equitable estoppel unless the elements of equitable estoppel are present and unless it is in the public interest to apply the doctrine. *Cablevision, supra.*

"The elements of equitable estoppel are:
(1) A representation or concealment of material facts;
(2) The representation must have been made with knowledge of the facts;

(3) The party to whom it was made must have been ignorant of the matter;
(4) It must have been made with the intention that the other party should act upon it;
(5) The other party must have been induced to act upon it."

*Advisory Board of Zoning Appeals of the City of Hammond v. The Foundation for Comprehensive Mental Health, Inc.* (1986), Ind.App., 497 N.E.2d 1089, 1092.

 In the case at bar, even if the trier of fact, the judge, believed Mr. Schopp's testimony, all five elements of equitable estoppel are not present. First we note that the court was not obligated to believe Mr. Schopp. *Morphew v. Morphew* (1981), Ind.App., 419 N.E.2d 770. Contrary to Salvage's contentions, "in Indiana, uncontroverted evidence is not necessarily binding on the trier of fact. It may be disbelieved and given no weight." *Id.* at 777. Mr. Schopp of Salvage testified about an unmemorialized, unwitnessed conversation he had with Mr. Poe, a Department official, in which Schopp alleges that Poe told him that a permit was not necessary.

Mr. Schopp inquired of a Department receptionist about talking to someone about a "question on solid waste". (R.199). Schopp did not tell the receptionist that he needed to speak with someone about permit requirements. He was referred to Mr. Poe; however, Poe was not authorized to make decisions regarding permits. These decisions are made at the deputy commissioner level.

Schopp testified that he spoke with Poe in the hallway outside Poe's office for about half an hour and told Poe the details of the proposed operation without the aid of diagrams or plans. Schopp stated that Poe offered a few suggestions. Schopp also claims that he asked Poe if a permit was needed for such an operation and that Poe represented to him that a permit would not be required. Salvage alleges that it entered into several contracts and proceeded with its operations in reliance upon Poe's alleged representations.

Victoria Schopp, President of Salvage, testified that Poe stated at a September,

1989, meeting that he could not remember what he told Curtis Schopp, though Poe said he remembered having met with Schopp. Salvage attempted to bolster Mr. Schopp's credibility regarding the conversation with Poe by eliciting testimony from two individuals to the effect that they each also had asked Poe and another lower level Department official whether or not permits were required for operations similar to those of Salvage. Both men testified that they were orally told that no permit was required.

Even if the court believed Mr. Schopp's testimony regarding the conversation with Mr. Poe, the court correctly found that the elements of equitable estoppel were not present. The court stated the following, in its Conclusions of Law:

"Actions based on oral confirmation and approval, without written confirmation and approval, are open to conflicting interpretations and the authority of those making any such statements. Placing full reliance on such oral expressions is to say the least hazardous and it is a practice which is not to be condoned."

(R.82).

Contrary to Salvage's contentions, this does not mean that the court held that oral representations can never be the basis for estoppel. The court simply expressed concern about the wisdom of relying upon oral representation such as the one in the instant case. The court was correctly stating that even if Poe made such a statement it was not reasonable for Salvage to rely on it because, under the circumstances, Poe did not have sufficient knowledge of Salvage's operation to make such a statement. Therefore, not all of the elements of equitable estoppel were present. *See Advisory Board, supra.*

■ Even if the elements of estoppel were present, in order to apply the doctrine against the government, it must be in the public interest to do so. *Cablevision, supra.* In the case at bar, Mr. Poe was not authorized to make decisions regarding permits. If he made a representation that a permit was not required, it was the kind of unauthorized representation by a government employee that has fostered the general rule that unauthorized misinformation by a government employee is not the basis of estoppel because estoppel based on such representations could stop the government from functioning. *Gressley, supra.*

Indiana courts have occasionally applied a public interest exception to this general rule. *See, e.g., Cablevision, supra.* Unfortunately, the decisions have done little to define when it is that public policy favors rather than opposes the application of estoppel. *Samplawski v. City of Portage* (1987), Ind.App., 512 N.E.2d 456, 459. In *Samplawski,* this court stated:

"[I]t would appear to favor the public interest that citizens be able to rely upon the representations made by their public officials, yet that interest is clearly outweighed in the statement of the general rule. Perhaps it is sufficient for present purposes to state that for an exception to the general rule to apply, there must be an articulable public policy reason which the court determines outweighs the public policy that supports denying estoppel."

*Id.*

In *Advisory Board,* the court found that the public interest would be threatened when the city, under its ordinance, issued building permits to a mental health foundation and then, after the foundation spent $151,000 for renovation, the city said, at the last minute, the foundation could not use the building as planned for a home for children in need of services. Salvage argues that there is no difference between the case at bar and *Advisory Board.* Salvage argues that it too expended large sums of money based on the government representation and that is the public policy exception noted in *Advisory Board.*

There are distinctions between the instant case and *Advisory Board.* In *Advisory Board,* the foundation relied upon an authoritative representation—an ordinance—as opposed to the unauthorized representation allegedly made by Mr. Poe. It is true that the main policy behind *Advisory Board* is the interest any citizen has when it expends large sums based upon

government's assurances that it can do something. *Advisory Board, supra* at 1092. However, in the case at bar, Salvage is a private business which faces a potential economic hazard as opposed to a charitable foundation like the one in *Advisory Board*. Another important distinction is that the foundation in *Advisory Board* in effect had a permit revoked, whereas Salvage never even applied for a permit.

Moreover, *Samplawski, supra,* indicates that we are to give deference to the trial court's weighing of the countervailing public policies. The public policy in favor of protecting Salvage's economic interests is outweighed by the countervailing public policy of protecting the citizenry by disallowing any facility which contributes to pollution without prior approval of the Department.[1] Therefore, even if the elements of estoppel were present, the government is not bound, in the instant case, because the public interest exception has not been satisfied.

*Issue IV—Requirements for Injunctive Relief*

Salvage claims that the trial court erred because it granted an injunction without any finding of (1) irreparable injury, (2) inadequacy of a remedy at law, (3) lack of capability of curing any environmental threat posed by Salvage's operation, or (4) that a balance of all the equities, including both public and private interests affected, favored an injunction. We begin by examining the standard for reviewing the grant of an injunction.

As the Department correctly points out in its brief, Salvage carries a heavy burden to overturn the injunction. The standard for appellate review has been summarized as follows:

"We recognize that the grant or denial of an injunction is a discretionary matter for the trial judge, whose action will be reversed only upon a showing of abuse.

As a court of appeal we engage in any reasonable presumption in favor of the trial court; we do not presume error, but affirm the trial court's decision if it is sustainable on any valid legal theory. Our judgment is not substituted for the trial court's even though the circumstances might have justified a different result. Rather, only when the trial court's action was clearly against the logic and effect of the circumstances will an abuse of discretion be found on appeal."

*State ex rel Stream Pollution Control Board v. Town of Wolcott* (1982), Ind.App., 433 N.E.2d 62, 65. (citations omitted).

Salvage claims that the court erred by granting the injunction without a finding that there was no adequate remedy at law. We disagree. In the instant case, no such finding was necessary.

IC 13–7–12–2, which authorizes the Department to seek injunctive relief reads as follows:

"In addition to the authority contained in section 1 of this chapter, and not withstanding any other provision of this article, *the commissioner, upon receipt of evidence* that a pollution source or combination of sources, including an industrial user of a publicly owned treatment plant, is presenting an *imminent and substantial endangerment* to the health of persons, or to the welfare of persons where such endangerment is to the livelihood of such persons, shall bring suit on behalf of the state in the appropriate court to *immediately restrain* any person causing or contributing to the alleged pollution to stop the discharge or introduction of contaminants causing or contributing to such pollution or to take such action as may be necessary."

(emphasis added).

By enacting IC 13–7–12–2, the legislature has declared that if any pollution source

---

**1.** IC 13–7–4–1 requires any facility which may cause pollution to get prior approval from the Department. IC 13–7–4–1 provides in pertinent part as follows:

Sec. 1. *No person may* do any of the following

\*　　\*　　\*　　\*　　\*　　\*

(6) *Construct, install, operate, conduct,* or modify, without prior approval of the department, *any equipment or facility of any type which may cause or contribute to pollution* or which may be designed to prevent pollution. . . .

(emphasis added).

poses an imminent and substantial endangerment, there is no adequate remedy at law. *See Union Ins. v. State Ex Rel Ind. Dept. of Insurance* (1980), Ind.App., 401 N.E.2d 1372. No separate proof or finding of this element is required. *Id.* "It is within the power of the Indiana General Assembly to modify common law rules and remedies." *Id.* at 1375.

■ In the instant case, the permit requirement is to protect the public from inherent dangers of waste processing facilities through inspection by the Department and through correction of potential hazards. Therefore, a facility without a permit posses an imminent and. substantial endangerment to the health and welfare of the people in the area. Failure by such a facility to obtain a permit, therefore, is a situation in which no adequate remedy at law exists. Even if IC 13–7–12–2 is not interpreted as authorizing an injunction, in this case injunctive relief would be allowed without proof or findings that no adequate remedy at law exists because the protection of the public welfare is involved. *See State ex rel Indiana State Board of Dental Examiners v. Boston System Dentists, Etc.* (1939), 215 Ind. 485, 19 N.E.2d 949.

Salvage cites *Amoco Production Company v. Gambell* (1987), 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542, for the proposition that the equities *must* be balanced even when violation of a statute is sought to be prevented. *Amoco* does not stand for that proposition. The Court in *Amoco* stated that existence of a federal statute did not restrict the court's jurisdiction in equity. *Id.* This means that, even when a statute is involved, the trial court may balance the equities. The opinion does *not* state that in a situation such as the case at bar, the trial court is *obligated* to balance the equities when the acts sought to be enjoined have been declared unlawful or declared against the public interest. It is true, as Salvage has pointed out, that some other federal circuit courts have held that it is an abuse of discretion for a trial court to presume irreparable harm and not to explicitly apply the traditional equitable standards in determining whether an in-

junction is appropriate for remedying environmental statutory violations. *See, e.g., Natural Resources Defense Council v. Texaco* (3rd Cir.1990), 906 F.2d 934.

However, in *United States Environmental Protection Agency v. Environmental Waste Control, Inc.,* (7th Cir.1990), 917 F.2d 327, 332, the Seventh Circuit Court of Appeals disagreed, stating that:

> "the law of injunctions differs with respect to governmental plaintiffs ... as opposed to private individuals. Where the plaintiff is a sovereign and where the activity may endanger the public health, 'injunctive relief is proper, without resort to balancing.' Second in the case of public health legislation, the emphasis shifts from irreparable injury to concern for the general public interest."

(citations omitted).

Furthermore, in *Rees v. Panhandle Eastern Pipeline* (1978), 176 Ind.App. 597, 377 N.E.2d 640, we stated:

> "[W]hen acts sought to be enjoined have been declared unlawful or declared against the public interest, plaintiff need show neither irreparable injury nor a balance of hardship in his favor."

*Id.* at 649.

Salvage's acts have been declared unlawful. As noted earlier in this opinion, IC 13–7–4–1 declares that no person may operate a facility that contributes to pollution without prior approval of the Department. Furthermore, Salvage's operations are unlawful under the regulations of the Board. Additionally, Salvage's unapproved operation, with box cars which contain up to 95 tons of garbage—often sitting for days without being unloaded—is not in the public interest because of the potential health hazards.

Here, the trial court was also correct in granting the injunction and in not accepting Salvage's assurances that they would operate in an environmentally suitable way while seeking a permit. In *Wolcott, supra,* a case involving an open dump, we said that the trial court erred in not granting an injunction and by accepting the owner's assurances that he would clean up and improve the area.

Indiana has not abandoned the *Rees* rule. The trial court did not abuse its discretion, under the circumstances of this case, by granting an injunction without expressly balancing the hardships and without finding irreparable injury.

*Issue V—Commerce Clause*

Salvage claims the trial court did not consider whether or not the Department's efforts to block Salvage's off-loading operation by requiring a permit controverted the Commerce Clause of the United States Constitution. At final argument, the trial court indicated it would reserve the commerce clause issue for another day.

 It is true that waste has been deemed to be "commerce" and that states cannot ban the importation of waste from other states. *City of Philadelphia v. New Jersey* (1978), 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475. However, this case does not involve a ban nor is it an obvious case of protectionism as in *City of Philadelphia*. Unlike the statutes and regulations in the instant case, in the *City of Philadelphia, supra*, the New Jersey statute [2] did not evenhandedly regulate all facilities that processed or disposed of waste (regardless of the origin of the waste). The New Jersey statute regulated the importation of waste rather than the facilities which handled the waste. It effectively prevented out-of-state waste from entering New Jersey.

Interpreting the Board's regulation to cover operations such as Salvage's is not a ban but an "evenhanded" requirement that such operations get permits in order to protect the public health and safety. *See Pike v. Bruce Church* (1970), 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174. Transfer stations at which trash is transferred into larger trucks have long been required to obtain permits under the same regulation. *See* 329 IAC 2–2–1(58) and 329 IAC 2–3–1. Salvage is, in effect, arguing that it is acceptable to apply the Board's regulation to transfer stations handling primarily local waste but not to apply the regulations to facilities handling out-of-state waste.

In *Pike v. Bruce Church* (1970), 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174, the Supreme Court stated the standard for determining the validity of statutes that impact interstate commerce but regulate "evenhandedly" as follows:

"Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

*Id.* at 142, 90 S.Ct. at 847. (citations omitted).

The Department's construction of its regulation meets the standards of *Pike*. The regulation (1) effectuates a legitimate local interest, (2) has only incidental effects on interstate commerce, and (3) does not burden commerce excessively in relation to local benefits. *Id.*

Railroad cars which transport waste certainly have the potential to leak unhealthy substances and to emit foul odors. The state has a legitimate interest in protecting the health and safety of its citizens. Requiring facilities which handle railroad cars containing out of state waste to obtain permits places no greater burden on these facilities than facilities which handle primarily intrastate waste. The regulation is narrowly tailored to meet the State's legitimate interests.

Salvage's contention that the Department's interpretation of the regulation is deserving of strict scrutiny because it is protectionistic, as evidenced by an Executive Order issued by Governor Bayh, is incorrect.[3] A primary purpose of the Executive Order was to notify haulers who bring waste in from out-of-state that they

---

**2.** N.J.Stat.Ann. § 13:1I–10.

**3.** Executive Order 89–17.

must obey the health and safety regulations of Indiana. The Executive Order was not only dated after the events giving rise to this case but, moreover, it was dated two weeks after the Department commenced this case.

Furthermore, as noted earlier, failure to enforce the regulation against facilities receiving waste by rail would actually be giving them preferential treatment. Salvage has not demonstrated that the regulations are not neutral or "evenhanded". Therefore, if there was any error committed by the trial court in not considering the Commerce Clause implications, it was harmless.

*Issue VI—Pre-emption*

Salvage's final argument is that the preliminary injunction should be overturned because it claims that the Department's effort to impose a license requirement upon Salvage is pre-empted by federal law and the trial court lacked subject matter jurisdiction to grant the Department the relief it sought. Salvage is incorrect in its claim that the trial court lacked subject matter jurisdiction.

■■■ Underlying Salvage's claim is the premise that federal issues must be tried in federal courts and cannot first go through the state process. That is not true. *See Huffman v. Pursue Ltd.* (1975), 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482. Furthermore, in the first instance it is the trial court that determines whether or not it has subject matter jurisdiction. We have stated that:

> "Where the record does not disclose the lack of jurisdiction, we cannot presume that it was absent. If we indulge in any presumption, it must be in favor of the trial court's action."

*Schoffstall v. Failey* (1979), 180 Ind.App. 528, 532, 389 N.E.2d 361, 364.

■■■ The trial court did not err in finding that it had subject matter jurisdiction. Furthermore, the Department's regulations at issue which require a permit for Salvage's facilities were not pre-empted by the Interstate Commerce Act, contrary to Salvage's contentions. The United States Supreme Court has stated that:

> "Pre-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' "

*Chicago & N.W. Transportation v. Kalo Brick & Tile* (1981), 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul* (1963), 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248).

The rationale of the pre-emption doctrine is that the Supremacy Clause invalidates state laws that "interfere with or are contrary to the laws of Congress ...". *Chicago & N.W. Transportation, supra,* 450 U.S. at 317, 101 S.Ct. at 1130. An interstate commerce preemption determination has a checklist:

> " '... [A] court must find local law pre-empted by federal regulation whenever the challenged state statute stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' Making this determination 'is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict.' And in deciding whether any conflict is present, a court's concern is necessarily with 'the nature of the activities which the states have sought to regulate, rather than on the method of regulation adopted.' "

*Id.* (citations omitted).

There have been several cases in which local laws were found to be pre-empted; however, the regulations and the subject matter of those regulations were much different than those in the present case. The Supreme Court has held that state statutes attempting to regulate rates of a rail common carrier are clearly pre-empted. *See Texas & Pacific R. Co. v. Abilene Cotton Oil Co.* (1907), 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553. In *Transit Comm'n v. United States* (1933), 289 U.S. 121, 53 S.Ct. 536, 77 L.Ed. 1075, the Supreme Court held that

the Interstate Commerce Commission had exclusive statutory authority to regulate extensions of service and that the state commission could not act in the same area. In *City of Chicago v. Atchinson T. & S.F.R.R.* (1958), 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174, the Supreme Court held that a city ordinance which required a railroad to get a license before it could transfer passengers was pre-empted because carriers were authorized to do that by the Interstate Commerce Act. Additionally, it has been held that the Interstate Commerce Commission has been given broad power by Congress to regulate a carrier's permanent or temporary cessation of service over lines used for interstate commerce and states cannot regulate in that area. *Chicago N.W. Transportation, supra.* "State efforts to regulate commerce must fall when they conflict with or interfere with federal authority over the same activity." *Id.* 450 U.S. at 319, 101 S.Ct. at 1131.

Here, federal authority does not extend to health and safety regulations over Salvage's facilities. That is what is at issue here—whether the Department is pre-empted from requiring a permit for Salvage's facilities at which the waste is to be unloaded. This is not a case involving rates or routes of a common carrier which would clearly be pre-empted by the Interstate Commerce Act. Furthermore, no argument is presented that Salvage is even a common carrier which would bring its facilities under the purview of the Act. Since Salvage's facilities are not directly covered by the provisions of the Interstate Commerce Act, the only question that remains is whether the permit requirement, when applied to Salvage's operations, "is 'inconsistent' with the policy of the Interstate Commerce Act to foster efficient interstate transportation." *City of Chicago, supra,* 357 U.S. at 83, 78 S.Ct. at 1067.

The Supreme Court has stated that "local authorities are not foreclosed from regulating matters of local concern merely because there may be some incidental, but not burdensome, effect on interstate commerce." *Id.* at 90, 78 S.Ct. at 1070. "[B]ecause regulation of local incidents of interstate transportation is, as a practical matter beyond the effective reach of Congress, there would frequently be an undesirable absence of needed regulation unless states and municipalities were free to act." *Id.* Even if it were determined that Salvage's operation was an "incident" of transportation, simply requiring a permit for the facility is not burdensome. The Interstate Commerce Act does not regulate the facilities to ensure that waste is unloaded in an environmentally sound manner—even though such requirements are obviously desirable.

Salvage argues, in effect, that any company that has a railroad siding can unload anything at its facility without being subject to local health, safety, or environmental regulation merely because the cargo was off-loaded from a railroad car. This is an untenable position. Local health, safety and environmental regulations covering Salvage's facilities do not interfere with or come into conflict with federal laws governing the activities covered by the Interstate Commerce Act. Moreover, the Department permit requirement is not inconsistent with the general policies behind the Interstate Commerce Act.

For all of the foregoing reasons, we affirm.

CHEZEM and ROBERTSON, JJ., concur.