**MARION COUNTY, Indiana, ex rel. Bart Peterson, in his official capacity as Executive of Marion County; and St. Joseph County, Indiana, Appellants–Plaintiffs,**

v.

**STATE of Indiana; Tim Berry, in his official capacity as Auditor of State; Richard Mourdock, in his official capacity as Treasurer of State; Christopher A. Ruhl, in his official capacity as Director of the State Budget Agency; and J. David Donahue, in his official capacity as Commissioner of the Indiana Department of Correction, Appellees–Defendants.**

No. 73A01–0705–CV–238.

Court of Appeals of Indiana.

June 13, 2008.

Geoffrey Slaughter, Taft Stettinius & Hollister LLP, Indianapolis, IN, Attorney for Appellants.

Steve Carter, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellees.

## OPINION

MAY, Judge.

For many years, Indiana counties have been required to pay a portion of the cost of operating juvenile detention facilities. When the State attempted to collect a combined arrearage of approximately $75 million from Marion and St. Joseph Counties, the Counties filed a lawsuit seeking relief from their debts. The trial court entered summary judgment for the State, and we affirm.[1]

### FACTS AND PROCEDURAL HISTORY

Article 9, Section 2 of the Indiana Constitution provides: "The General Assembly shall provide institutions for the correction and reformation of juvenile offenders." As of 1953, Indiana had two such institutions: the Indiana Boys' School (later renamed Plainfield Juvenile Correctional Facility and hereinafter referred to as "Plainfield"), and the Indiana Girls' School (later renamed Indianapolis Juvenile Correctional Facility and hereinafter referred to as "Indianapolis"). From 1953 to 2005, Ind.

---

1. We heard oral argument on April 17, 2008 at the University of Southern Indiana. We thank USI for its hospitality and commend counsel for the quality of their advocacy.

Code § 4–24–7–2 (or its predecessor) authorized the State to recoup from the counties a portion of its expenses for operating these facilities.

In 2005, the General Assembly enacted legislation requiring counties owing money for the operation of juvenile facilities to agree to a plan for repaying their outstanding balance. Pub.L. No. 246–2005, § 237. If a county did not enter a repayment plan, it would lose property tax replacement credits. *Id.*

The State determined Marion County had an arrearage of more than $67 million. On July 12, 2005, Marion County filed suit against the State challenging this determination. St. Joseph County, which had an arrearage of approximately $7 million, intervened.

The Counties sought declaratory and injunctive relief and restitution of all their payments since 1995. They argued Art. 9, § 2 requires the State to pay the entire cost of operating juvenile facilities. In the alternative, they argued: (1) Ind.Code § 4–24–7–2 permits the State to charge the Counties only for expenses incurred by Plainfield and Indianapolis; and (2) all the accounts submitted to the Counties since 1995 are invalid because they did not comply with the signature and attestation requirements of Ind.Code § 4–24–7–4. The State argued the Counties lacked standing and their suit is barred by the statute of limitations and the doctrine of laches.

The State and the Counties filed cross-motions for summary judgment. On May 1, 2007, the trial court granted summary judgment for the State. The trial court found the State had established each of its defenses and also found for the State on the merits of the Counties' claims.

## DISCUSSION AND DECISION

The Counties raise several issues on appeal:

(1) whether the Counties have standing to bring this suit;

(2) whether the Counties' claims are barred by the statute of limitations;

(3) whether the Counties' claims are barred by the doctrine of laches;

(4) whether Art. 9, § 2 of the Indiana Constitution requires the State to pay all costs of operating juvenile facilities;

(5) whether the State's failure to comply with signature and attestation requirements renders the accounts invalid; and

(6) whether the trial court erred by holding the State could recoup expenses for facilities other than Plainfield and Indianapolis.

In reviewing summary judgment, we apply the same standard as the trial court. *Wright v. Am. States Ins. Co.*, 765 N.E.2d 690, 692 (Ind.Ct.App.2002). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). "Any doubt as to a fact, or an inference to be drawn, is resolved in favor of the non-moving party." *Sanchez v. Hamara*, 534 N.E.2d 756, 757 (Ind.Ct.App.1989), *trans. denied.* The moving party bears the burden of proving there is no genuine issue of material fact; however, once this burden is sustained, the opponent may not rest on the pleadings, but must set forth specific facts showing there is a genuine issue for trial. T.R. 56(E); *Oelling v. Rao*, 593 N.E.2d 189, 190 (Ind.1992). We consider only the evidence designated to the trial court. T.R. 56(H); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind.2001).

We affirm summary judgment on any legal basis supported by the designated evidence. *Bernstein v. Glavin*, 725 N.E.2d

455, 458–59 (Ind.Ct.App.2000), *trans. denied* 741 N.E.2d 1248 (Ind.2000). The appellant bears the burden of persuading us the grant of summary judgment was erroneous. *Bank One Trust No. 386 v. Zem, Inc.*, 809 N.E.2d 873, 878 (Ind.Ct.App. 2004), *trans. denied* 822 N.E.2d 975 (Ind. 2004). That the parties made cross-motions for summary judgment does not alter our standard of review. *Green Tree Servicing, LLC v. Random Antics, LLC*, 869 N.E.2d 464, 467–68 (Ind.Ct.App.2007). We consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.* at 468.

### 1. *Standing*

 The Counties have standing. Standing is a limit on the court's jurisdiction. *Pence v. State*, 652 N.E.2d 486, 488 (Ind.1995), *reh'g denied*. Standing "focuses on whether the complaining party is the proper person to invoke the court's power." *State ex rel. Cittadine v. Ind. Dep't of Transp.*, 790 N.E.2d 978, 979 (Ind.2003). Only persons "who have a personal stake in the outcome of the litigation and who show that they have suffered or were in immediate danger of suffering a direct injury as a result of the complained-of conduct will be found to have standing." *Id.* The standing requirement is designed to ensure "litigation will be actively and vigorously contested." *State ex rel. State Bd. of Tax Comm'rs v. Marion Superior Court*, 271 Ind. 374, 392 N.E.2d 1161, 1164 (1979) (quoting *Ind. Educ. Employment Relations Bd. v. Benton Comty. Sch.*, 266 Ind. 491, 365 N.E.2d 752, 754 (1977)). It "mandates that courts act in real cases and refrain when called to engage in abstract speculation." *Schulz v. State*, 731 N.E.2d 1041, 1044 (Ind.Ct.App.2000), *trans. denied* 741 N.E.2d 1259 (Ind.2000).

The State asserts that, "with rare exceptions, a county and its government have no standing and are powerless to challenge the constitutionality of a state statute," and cites *Bd. of Comm'rs of Howard County v. Kokomo City Plan Comm'n*, 263 Ind. 282, 330 N.E.2d 92 (1975). *Howard County* does not hold a county may not seek to invalidate a statute; rather, a county cannot do so in the absence of any injury to the county itself. *See Howard County*, 330 N.E.2d at 101; *compare Ind. Dep't of Natural Resources v. Newton County*, 802 N.E.2d 430, 433 (Ind.2004) (county had standing to challenge constitutionality of state statute because it demonstrated it had an interest in enforcing its ordinances).[2]

The State also argues the Counties are attempting to assert the claims of their residents. *See Howard County*, 330 N.E.2d at 101 (counties cannot act as *parens patriae*). The State compares the case before us to *Shoemaker v. Bd. of Comm'rs of Grant County*, 36 Ind. 175 (1871), wherein Grant County sued the State Auditor to collect an overpayment of its residents' property taxes. Our Supreme Court held the county did not have standing because the money belonged to the residents, and the county had no interest in the money. *Id.* at 183. The State argues *Shoemaker* controls because the Counties are seeking to collect money paid by their resident taxpayers.

*Shoemaker* is distinguishable. Even if a county has no interest in taxes its resi-

---

**2.** The State also argues the Counties "cannot prevent a state agency from carrying out statutorily authorized actions." *Newton County*, 802 N.E.2d at 433. The *Newton County* Court made this statement in finding Newton County's ordinances violated the Home Rule Act; it was not part of the court's discussion of Newton County's standing to challenge the constitutionality of the Game Bird Habitat Act.

dents pay to the State, it does have an interest in funds paid out of its own treasury. It is the Counties, and not individual citizens, that are charged with paying a portion of the costs of incarcerating juveniles and that were required to enter repayment plans to avoid the loss of property tax replacement credits.

■ Counties and their officials "possess standing to challenge an interpretation or application of a statute if it can be demonstrated that the party is seeking the resolution of a legitimate controversy surrounding the operation of the statute." *Marion Superior Court*, 392 N.E.2d at 1164. "It would be anomalous indeed for us to hold that a county or its officials cannot resolve in a court of law a bona fide dispute with a state agency over the application of a state statute." *Id.* at 1165. The Counties have a stake in the $75 million at issue in this case. This sum represents a bona fide dispute between adverse parties. Therefore, we conclude

the trial court erred by holding the Counties lacked standing.

### 2. Statute of Limitations

■ The trial court held the Counties' constitutional claim was barred by the statute of limitations. It also held their claim they were required to pay only for Plainfield and Indianapolis was time-barred.[3]

The State characterizes the Counties' claims as facial challenges and argues a facial challenge accrues when the statute is enacted. The State relies primarily on three decisions from other jurisdictions: *Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516 (6th Cir.1997); *De Anza Properties X, Ltd. v. County of Santa Cruz*, 936 F.2d 1084 (9th Cir.1991); and *Williams v. Blue Cross Blue Shield of North Carolina*, 357 N.C. 170, 581 S.E.2d 415 (2003). However, none of those decisions holds a facial challenge always accrues when a statute is enacted.[4]

---

3. The trial court held the Counties' constitutional claims are barred by Ind.Code § 34–11–1–2(b), which provides that a cause of action arising before September 1, 1982, which is not limited by any other statute, must be brought within fifteen years. As to the Counties' claim they were not required to pay for facilities other than Plainfield and Indianapolis, the trial court held it "need not consider which limitation to apply, because even the lengthiest statutory period [fifteen years] defeats those complaints." (Appellants' App. at 50.) As to the Counties' claim the accounts were not properly signed and attested, the trial court concluded:

> It is unclear from the evidence whether the ten year, fifteen year or two year limits apply. The facts are not settled regarding which bills, in terms of both time and institution, were properly signed and attested. Thus, for purposes of Summary Judgment the Court determines that factual issues still exist regarding application of Statutes of Limitation or the Indiana Tort Claims Act....

(*Id.* at 50–51.)

4. *Kuhnle Brothers* and *De Anza* both involved claims that a law effected a taking without just compensation. The *Kuhnle Brothers* Court relied on *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680 (9th Cir.1993), *cert. denied* 510 U.S. 1093, 114 S.Ct. 924, 127 L.Ed.2d 217 (1994). The *Levald* Court concluded *De Anza* did not stand for the proposition that all facial takings claims accrue when the statute is enacted. *Id.* at 688. The *Levald* Court also distinguished takings claims from other types of claims:

> In other contexts, the harm inflicted by the statute is continuing, or does not occur until the statute is enforced—in other words, until it is applied. In the takings context, the basis of a facial challenge is that the very enactment of the statute has reduced the value of the property or has effected a transfer of a property interest. This is a single harm, measurable and compensable when the statute is passed.

*Id.*
In *Williams*, Blue Cross Blue Shield (BCBS) argued a county civil rights ordinance violated the North Carolina constitution after

■ We agree with the Counties that the "continuing violation" doctrine controls. We have recognized two categories of cases in which the continuing violation doctrine applies:

The first includes cases in which the original violation occurred outside the statute of limitations, but is closely related to other violations that are not time-barred. In such cases, recovery may be had for all violations, on the theory that they are part of one, continuing violation.

The second type of continuing violation is bne in which an initial violation, outside the statute of limitations, is repeated later; in this case, each violation begins the limitation period anew, and recovery may be had for at least those violations that occurred within the period of limitations.

*Parker v. Schilli Transp.*, 686 N.E.2d 845, 849 (Ind.Ct.App.1997) (quoting *Hendrix v. City of Yazoo City*, Miss., 911 F.2d 1102, 1103 (5th Cir.1990)), *trans. denied* 690 N.E.2d 1183 (Ind.1997).[5]

The Counties' claims are of the second type. The Counties did not suffer a "single harm, measurable and compensable when the statute is passed." *Levald*, 998 F.2d at 688. When the statutes were enacted, the Counties could not have known how many juveniles it would commit or what the State would charge. The harm was not measurable until the State issued accounts. Therefore, each account began a new limitations period, and the Counties are entitled to pursue relief from the accounts issued within the limitations period.

Ind.Code § 34–11–1–2(a) provides that a cause of action arising on or after September 1, 1982 that is not limited by any other statute must be brought within ten years. The Counties filed suit on July 12, 2005. Therefore, their claims accruing since July 12, 1995 are within the limitations period.

*3. Laches*

■ We decline the State's invitation to hold the Counties' claims are barred by laches. The doctrine of laches may operate to bar equitable relief. *SMDfund, Inc. v. Fort Wayne–Allen County Airport Auth.*, 831 N.E.2d 725, 729 (Ind.2005), *cert. denied* 546 U.S. 1093, 126 S.Ct. 1051, 163 L.Ed.2d 859 (2006). Laches and estoppel may not be asserted against governmental bodies, *Cablevision of Chicago v. Colby Cable Corp.*, 417 N.E.2d 348, 354 (Ind.Ct.App.1981), unless the party claiming laches or estoppel can show it is not inconsistent with the public interest. *Muncie Indus. Revolving Loan Fund Bd. v. Ind. Constr. Corp.*, 583 N.E.2d 769, 772 (Ind.Ct.App.1991), *reh'g denied, trans. denied.* We balance the competing interests when determining whether to apply laches against a govern-

BCBS was sued under that ordinance. Williams argued the statute of limitations began to run when the ordinance was enacted. The *Williams* Court held there was a continuing violation because any harm to BCBS was speculative at the time the ordinance was enacted. 581 S.E.2d at 423. The *Williams* Court distinguished cases in which the ordinances in question "provided notice at the moment the ordinances were passed that [the plaintiffs] would suffer a specific loss at a specific time." *Id.* at 424.

**5.** *Parker* involved a claim for overtime wages under the Fair Labor Standards Act. Relying on federal case law, we applied the continuing violation doctrine and held each paycheck began a new limitations period. The doctrine has also been applied to State laws. *See Ind. State Employees Appeal Comm'n v. Bishop*, 721 N.E.2d 881 (Ind.Ct.App.1999) (requirement that certain State employees work forty hours a week for same pay as others who worked 37.5 hours a week in violation of provisions of the Indiana Administrative Code was a continuing violation), *aff'd* 741 N.E.2d 1229 (Ind.2001).

mental body. *Nat'l Salvage & Serv. Corp. v. Comm'r of Ind. Dep't of Envtl. Mgmt.*, 571 N.E.2d 548, 557 (Ind.Ct.App.1991), *trans. denied, cert. denied.*

Here, the State and the Counties have essentially the same interest: one or the other will have $75 million less with which to carry out its functions. Both parties represent a public interest. *See City of Crown Point v. Lake County*, 510 N.E.2d 684, 687–88 (Ind.1987) (holding Lake County could not assert estoppel against the City of Crown Point). There is a dispute concerning the respective responsibilities of the State and the Counties, and we prefer to provide clarification rather than hold the Counties' claims barred by the doctrine of laches.

4. *Art. 9, § 2*

The Statutes requiring counties to contribute to the cost of operating juvenile facilities are constitutional. We analyze "questions arising under the Indiana Constitution by examining the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions." *Ind. Gaming Comm'n v. Moseley*, 643 N.E.2d 296, 298 (Ind.1994). The intent of the framers "is paramount in determining the meaning of a provision," and we consider "the purpose which induced the adoption." *Eakin v. State ex rel. Capital Improvement Bd. of Managers of Marion County*, 474 N.E.2d 62, 64–65 (Ind.1985). Every statute is "clothed with the presumption of constitutionality until clearly overcome by a contrary showing." *State v. Rendleman*, 603 N.E.2d 1333, 1334 (Ind.1992). The party challenging the constitutionality of the statute bears the burden of proof. *Id.*

The Counties note Art. 9, § 2 states, "The *General Assembly shall provide* in-stitutions for the correction and reformation of juvenile offenders." (emphasis added). They argue "shall provide" means the State is to bear full responsibility for the costs of operating juvenile facilities. However, nothing in the text of Art. 9, § 2 limits the General Assembly's discretion to determine the method for funding the facilities. It would be unusual and impractical for the constitution to specify how the facilities should be funded. *See State v. Nixon*, 270 Ind. 192, 384 N.E.2d 152, 156 (1979) ("It would not be practicable, if possible, in a written constitution, to specify in detail all its objects and purposes, or the means by which they are to be carried into effect.") (quoting *Ellingham v. Dye*, 178 Ind. 336, 99 N.E. 1, 16 (1912)).

The history of Art. 9, § 2 was outlined in *Ratliff v. Cohn:*

At Indiana's constitutional convention in 1850–51, the following text for Article 9, Section 2 was proposed: "The General Assembly shall have the power to provide Houses of Refuge for the correction and reformation of juvenile offenders." When this provision was subsequently discussed at the convention, Delegate James Bryant of Warren County moved to amend the proposed language to state that the General Assembly *shall provide* Houses of Refuge, "so as to *make it obligatory upon the General Assembly to provide houses of refuge for juvenile offenders, instead of referring the subject to the discretion of that body*, as proposed by the reported section." He justified this amendment by stating, "Since this Convention assembled, we have had a state of facts presented to us, such as I had previously no conception of." That previously unknown information involved the fact that "more than one-eighth of the whole number" of convicts committed to the Indiana State prison from September, 1822, to Novem-

ber, 1850, "were minors within the age of twenty-one years, and some of these as young as eleven years of age."

... He concluded, "With such facts before us, *it is the imperative duty of the Convention to ... compel the General Assembly to provide institutions where these juvenile offenders can be restrained, and at the same time reformed.*"

693 N.E.2d 530, 534–35 (Ind.1998) (emphases added) (internal citations omitted), *reh'g denied.*[6] The Counties argue the emphasized portions indicate the framers intended to obligate the State to pay for the operation of juvenile facilities. However, these excerpts from the debates express no opinion as to how juvenile facilities should be funded; the framers' concern was simply that these institutions be established.

The Counties claim the early legislation implementing Art. 9, § 2 supports their interpretation. In 1855, the General Assembly passed an Act directing three state officials (the governor, the state treasurer, and the superintendent of public instruction) to select and purchase a site suitable for a juvenile facility, arrange for its construction and management, and determine what laws would be necessary for its successful operation. *See Ratliff,* 693 N.E.2d at 537. In 1867, the General Assembly passed an act titled "An act to establish a House of Refuge for the correction and reformation of juvenile offenders." *See McCaslin v. State ex rel. Evans,* 44 Ind. 151, 178 (Ind.1873). The 1867 Act directed that the funds for the House of Refuge be paid out of the state treasury upon the warrant of the governor. *Id.* These acts demonstrate the State chose to fund juvenile facilities itself, but they do not demonstrate the State was obligated to pay for

them entirely. We do not believe the State should be bound by the manner in which it implemented Art. 9, § 2 in 1855 and 1867.

Finally, the Counties argue *McCaslin* indicates our Indiana Supreme Court understood Art. 9, § 2 to obligate the State to pay for juvenile facilities. Referring to the 1867 Act, the Court stated:

> The legislature, in obedience to this imperative requirement of [Art. 9, § 2], passed the act in question. Inasmuch as such institution was to be established, controlled, and maintained by the State in her sovereign capacity, funds for its erection and maintenance had to be provided by the State.

*McCaslin,* 44 Ind. at 180. *McCaslin,* however, concerned a contract dispute and did not decide how juvenile facilities are to be funded. Nothing in *McCaslin* indicates full funding by the State is the only manner in which the "imperative requirement" of Art. 9, § 2 may be fulfilled. Therefore, we conclude the Counties have not overcome the presumption the statutes requiring them to share in the cost of operating juvenile facilities are constitutional.

5. *Signature and Attestation Requirements*

■ The statutory collection procedures for juvenile accounts at issue include signature and attestation requirements:

> [A]ccounts of state institutions as are described in [Ind.Code § 4–24–7–2] shall be paid as follows:
>
> (1) All such accounts shall be signed by the superintendent of the institution, attested to by the seal of the institution, and forwarded to the auditor of the county for payment from the

---

6. Art. 9, § 2 originally referred to "Houses of Refuge." In 1984, that phrase was replaced

with the word "institutions." *See* Art. 9, § 2 historical notes.

county from which the inmate ... was admitted.

Ind.Code § 4–24–7–4 (2004).[7] The State did not comply with these procedures. For each billing period from January 1995 through June 2002, the accounts were signed only by the superintendents of Plainfield and Indianapolis and did not bear the seal of any institution. For each billing period from July 2002 through July 2005, the accounts were signed by the chief financial officer of the DOC and did not bear the seal of any institution.

The trial court held the State's noncompliance was not the proximate cause of any alleged damage to the Counties and applied the doctrine of *de minimis non curat lex. See D & M Healthcare, Inc. v. Kernan,* 800 N.E.2d 898, 900 (Ind.2003) (The phrase means "the law does not redress trifles."). The Counties argue the State's noncompliance had more than a *de minimis* effect, citing evidence they believe indicates the DOC billed them for more than the statutes allow. The Counties' share is based on a facility's operating expense. Ind.Code § 11–10–2–3. In the case of privately-owned facilities, the DOC charged the Counties half of its total negotiated cost for assigning a juvenile to a particular facility, which included some profit. In the case of State-owned facilities, the DOC included expenses such as medical care and the construction of new facilities, which the Counties argue cannot be considered "operating expenses."

We agree with the trial court that these alleged overcharges are not sufficiently connected to the signature and seal requirements of Ind.Code § 4–24–7–4. The DOC consistently provided detailed bills to the Counties. The bills contained the names of juveniles, facility locations, dates of incarceration, total days of incarceration, daily costs, and the amount owed for each juvenile. (*See, e.g.,* Appellants' App. at 1741.) The bills were signed by an officer of the DOC. The DOC's billing procedure sufficiently fulfilled the purpose of Ind.Code § 4–24–7–4, and its failure to follow the statutory procedure was wholly trivial and had at most a *de minimis* effect on the Counties.

### 6. Costs for Facilities other than Plainfield and Indianapolis

■■ The Counties argue that even if they can constitutionally be required to pay, they are liable only for expenses of operating Plainfield and Indianapolis.[8] To provide context for the parties' arguments, we review the history of the statutes in question.

### A. History

In 1953, the General Assembly passed an act requiring the counties to pay a portion of the expenses of operating juvenile facilities. Acts 1953, ch. 165, Preamble. Section 2 of the Act, later codified at Ind.Code § 4–24–7–2, provided:

> For all claims that the Indiana Boys' School or the Indiana Girls' School may

7. This section was reorganized in 2005. This provision is currently codified at Ind.Code § 4–24–7–4(b), but has been repealed effective January 1, 2009. *See* Pub.L. No. 146–2008, § 15.

8. The State has opened and closed numerous facilities since 1995. (*See* Appellants' App. at 1712) (providing a list of opening and closing dates). Apparently, the State has always charged the Counties for the costs of all facilities in operation during the billing period. (*See id.* at 1704) ("[A]s other new juvenile facilities were opened by the state, each facility billed counties for juvenile expenses. Because [Plainfield and Indianapolis] had previously implemented a program and had trained employees ..., all billings ... were remitted through these two institutions.").

have against any county for the payment of the county's portion of the cost of the maintenance of any inmate of such institution, which inmate was admitted to such institution from such county, the superintendent of such institution shall make out an account therefor against such county, in a manner as hereinafter provided.

The DOC and the Board of Correction were created in 1953. Acts of 1953, ch. 266.

A major reorganization took place in 1979. Supervisory authority over the DOC changed from the Board of Correction to the Commissioner of Correction. Ind.Code §§ 11–8–2–4 and 5. The Commissioner was given authority to determine which facilities the DOC would maintain. Ind.Code § 11–8–2–7(a). Trial courts no longer determined a juvenile's placement; the juvenile was committed to the DOC, and the DOC determined which facility should house the juvenile. Ind.Code § 11–10–2–2. The General Assembly also adopted a formula for determining the counties' share of the expenses of incarcerating juveniles:

> A county that commits an offender to the department shall pay to the state treasurer, under IC 4–24–7–4, one-half (1/2) of the daily cost of keeping the offender in the facility or program to which he is assigned. That cost is determined by dividing the average daily population of that facility or program into the previous fiscal year's operating expense of that facility or program and dividing the quotient by the number of days in the previous fiscal year.

Ind.Code § 11–10–2–3(a) (2004).[9]

In 1979, a new juvenile facility was opened in Fort Wayne. In the 1990s, the State began placing juveniles in additional facilities, some publicly owned and some privately owned. Ind.Code § 4–24–7–2 was not amended until 1996, when "Indiana Boys' School" was replaced with "Plainfield Juvenile Correctional Facility," and "Indiana Girls' School" was replaced with "Indianapolis Juvenile Correctional Facility." Pub.L. No. 12–1996, § 5. None of the new juvenile facilities were mentioned in the amended statute. It was not until 2005 that the specific references to Plainfield and Indianapolis were replaced with a general reference to the DOC. Pub.L. No. 246–2005, § 43.

### B. Statutory Interpretation

■■■■ "When a statute is clear and unambiguous, we need not apply any rules of construction other than to require that words and phrases be taken in their plain, ordinary, and usual sense." *Poehlman v. Feferman*, 717 N.E.2d 578, 581 (Ind.1999), *reh'g denied.* "A statute is ambiguous when 'it is susceptible to more than one interpretation.'" *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 947 (Ind.2001) (quoting *Matter of Lehman*, 690 N.E.2d 696, 702 (Ind.1997)). "The goal of statutory construction is to determine, give effect to, and implement the intent of the legislature." *Collier v. Collier*, 702 N.E.2d 351, 354 (Ind.1998). Statutes relating to the same general subject matter "should be construed together so as to produce a harmonious statutory scheme." *Sanders v. State*, 466 N.E.2d 424, 428 (Ind.1984). When possible, every word must be given effect and meaning. *Hall Drive Ins., Inc. v. City of Fort Wayne*, 773 N.E.2d 255, 257 (Ind.2002).

---

**9.** This version of the statute was in effect from 1979 until 2005, when it was amended to make a county liable for $60 per day for each offender that county commits to the DOC. The statute has been repealed effective January 1, 2009. *See* Pub.L. No. 146–2008, § 808.

The Counties note the General Assembly did not amend Ind.Code § 4–24–7–2 as new facilities were added, even though the statute was updated in 1996 to reflect the Boys' and Girls' Schools' new names. They argue the 2005 amendment, which refers to the DOC instead of specific facilities, indicates the statute did not previously authorize the State to collect costs for facilities other than Plainfield and Indianapolis. The State acknowledges Ind. Code § 4–24–7–2 does not provide authority to charge for institutions other than Plainfield and Indianapolis, but argues § 11–10–2–3 provided independent authority for the DOC to recoup expenses for all juvenile facilities. This provision allows the DOC to recover "one-half (1/2) of the daily cost of keeping the offender *in the facility or program to which he is assigned.*" *Id.* (emphasis added).

The Counties' interpretation of Ind.Code §§ 4–24–7–2 and 11–10–2–3 would lead to an absurd and unjust result. *See Lehman,* 690 N.E.2d at 703 ("Statutes will be construed so as to prevent absurdity, hardship, or injustice."). It appears the General Assembly has always intended counties to bear part of the costs of housing juvenile offenders in the entire state system. When Ind.Code § 4–24–7–2 was enacted, Plainfield and Indianapolis were the only juvenile facilities in Indiana. When the General Assembly reorganized the DOC in 1979, it enacted Ind.Code § 11–10–2–3 to permit the DOC to recoup costs of keeping a juvenile "in the facility or program to which he is assigned." Because the DOC now had the authority to determine which facilities to operate and to assign juveniles to specific facilities, it no longer made sense for the General Assembly to identify specific facilities in the statutes. Therefore, Ind.Code § 11–10–2–3 refers generally to the facility or program to which the juvenile is assigned. Because the Counties were in arrears by 2005, we believe the

2005 amendment to Ind.Code § 42–4–7–2 was intended to clarify, and not to change, the law. *See Med. Disposal Servs. v. Ind. Dep't of Envtl. Mgmt.,* 669 N.E.2d 1054, 1058 (Ind.Ct.App.1996) (changes to a statute may be meant to clarify the law), *reh'g denied, trans. denied.* Therefore, we conclude the DOC had authority to charge the Counties for expenses incurred at all facilities.

## CONCLUSION

The Counties have standing to assert their claims, and their claims are not barred by the statute of limitations or the doctrine of laches. However, we conclude the trial court correctly decided the merits of the Counties' claims, and we affirm.

Affirmed.

BAKER, C.J., and DARDEN, J., concur.